319 So.2d 518 (1975)
Joaquin COUTO, Individually and as duly qualified natural tutor of Maria Defantima Couto, et al.
v.
Doctor Louis R. OMS and St. Paul Fire and Marine Insurance Company.
No. 6617.
Court of Appeal of Louisiana, Fourth Circuit.
September 9, 1975.
Rehearing Denied October 9, 1975.
Writ Granted November 21, 1975.
*520 Levy & Smith, Lawrence J. Smith, New Orleans, for plaintiffs-appellees.
Lemle, Kelleher, Kohlmeyer & Matthews, William S. Penick, New Orleans, for defendant-appellant St. Paul Fire and Marine Ins. Co.
Before SCHOTT, MORIAL and BEER, JJ.
*521 BEER, Judge.
This is malpractice litigation arising from alleged negligent failure of diagnosis and treatment on the part of Dr. Louis Oms which plaintiff claims has resulted in the death of his wife, Mrs. Joaquin Couto, and his unborn child. Mrs. Couto was eight months pregnant at the time of her death.
Various pretrial developments narrowed the issues so that at the commencement of the jury trial in March of 1974 the only actual parties to the litigation were: Joaquin Couto individually and as duly qualified natural tutor of his three children, and St. Paul Fire & Marine Insurance Company, the malpractice insurer of Dr. Oms. Dr. Oms' individual exposure (if any there was) in excess of the policy limits had been obviated by a settlement prior to trial. In connection with this settlement (which we will refer to later for other reasons) we now note that the fact of the settlement has played no part in our deliberation of the liability issues for it is apparent that Dr. Oms' decision to settle his individual exposure was based entirely on conclusions that bear no relationship to his own thought process determination of whether he was or was not in any way responsible for the death of Mrs. Couto. Our review of the record does not compel us to conclude that Dr. Oms was liable for her death. Yet, it has been determined by a jury verdict (9-3) that he was negligent and our review is, by mandate, restricted to an inquiry that necessarily precludes the substitution of our determination for that of the jury except in certain limited circumstances.
The general verdict in favor of the plaintiff particularized the damage awards as follows:
"We, the jury, find a verdict in favor of Joaquin Couto, Individually in the full sum of fifty thousand for the death of his wife, and in the full sum of seventyfive thousand for the death of his unborn child, and in favor of Joaquin Couto on behalf of the minor, Maria Desgracis Couto, in the full sum of five thousand and in favor of Joaquin Couto on behalf of the Minor Emmual Christian Couto in the full sum of five thousand for the death of their mother, and in favor of Maria DeFatima Couto in the full sum of five thousand for the death of her mother, and against the defendant, and for all costs. Signed Roger W. Rivet, Sr., foreman."
The defendant appealed and the plaintiff answered the appeal seeking an increase in the amount of the various awards.
The doctor-patient relationship between Dr. Oms and Mrs. Couto was established in the early months of Mrs. Couto's fifth pregnancy (she had four previous uncomplicated deliveries in her native Brazil but one child had, thereafter, died). From the outset there was somewhat of a language barrier because Mrs. Couto was limited to her native Portuguese and a little English while Dr. Oms, fluent in Spanish and English, had little experience with Portuguese and its similarity with Spanish is less than many think is the case.
Although hindsight discloses some minor irregularities, the general course of Mrs. Couto's pregnancyand of her patient-doctor relationship with Dr. Oms was more or less routine until December 14, 1970.
In the very early morning hours of December 14, Mrs. Couto apparently awakened with a need to use the bathroom. In going to or coming from the bathroom she fell and apparently injured her neck. The fall also caused her to be very concerned about her unborn child.
As a result, Mr. Couto, accompanied by other family members took his wife to the emergency room at Mercy Hospital in the midmorning of December 14. She was seen there at about 1:00 p. m. by Dr. Arnold Alper, the emergency room doctor, whose functions are markedly limited by the hospital rules. Essentially he determined *522 that Mrs. Couto was in no acute life-or-death distress and rendered no treatment to her. Thereafter, and in the accordance with the established emergency room routine, Mr. Couto was advised to and did take his wife to the office of her own physician, Dr. Oms, where the doctor saw her very early in the afternoon while he was holding his usual office hours. He apparently saw her out of turn and without an appointment because of her alleged distress.
Almost totally conflicting versions of Mrs. Couto's appearance, behavior, complaints and possible symptoms were presented to the jury in connection with this critical office visit. Plaintiff's witnesses (all either parties to the litigation or related to the parties) set a scene in which it would be hard for even an untrained layman to conclude that Mrs. Couto was in anything but obvious and serious distress. On the other hand, defendant's witnesses, including Dr. Oms, his office nurse and his secretary, indicate only that Mrs. Couto had complaints of pain in the neck area and that she expressed concern about possible harm to the baby because of the early morning fall. They also observed that she appeared to be whimpering because of the upset and possible discomfort related to her neck injury. Obviously there was, here, a clear-cut factual issue for the jury to resolve.
Dr. Oms performed an examination of Mrs. Couto and, in the process, made certain diagnostic teststhe accuracy, method, necessity for, and report of (in his own medical records) all forming, again, fact issues to be resolved by the jury when they retired to deliberate after hearing the testimony of other lay and expert witnesses, arguments of counsel and the court's charges.
Basically, plaintiff's contentions with respect to the alleged malpractice of Dr. Oms center around this visit. He avers that, at this particular point in time, Mrs. Couto was obviously in the advanced state of serious fulminating pre-eclampsia. Thus, he contends that if the examination by Dr. Oms had been properly conducted and the results of the examination properly considered by a physician applying acceptable community standards, a diagnosis of pre-eclampsia would have resulted. Thereupon, such measures as would have been necessary to hospitalize, treat and save the lives of Mrs. Couto and her unborn child would have been taken.
Defendant contends that none of the generally acknowledged danger signals for serious fulminating pre-eclampsia were present; that Dr. Oms made a satisfactory and acceptable examination under the circumstances; reached reasonable conclusions; and took the steps necessary and required including the administering of a shot of "Talwin" to relieve the pain and spasm resulting from Mrs. Couto's neck injury. Again, these were factual issues to be ultimately resolved by the jury in its deliberations.
After leaving Dr. Oms' office, the Coutos returned to their home in the middle of the afternoon. Mrs. Couto was put to bed at about 4:00 p.m. and died at about 6:30 or 7:00 p.m. that evening. Though she was not pronounced dead until examined at the Ochsner Memorial Hospital emergency room, she apparently expired at about 6:30 or 7:00 p.m. as she attempted to arise from or "sit up" in bed.
The coroner's report, which routinely notes various possible causes of death, includes eclampsia as a definite possibility.
Eclampsia is, essentially, a toxic condition of pregnancy causing convulsive seizures which can suddenly become acute during the last trimester. The very nature of its possible sudden acute onslaught, and the fact that it has a measurable incidence of fatality when the convulsive stage is reached, earmark it as the sort of malady that requires attention when any combination of danger signals or storm warnings herald its imminence.
*523 For these reasons, the condition described as "pre-eclampsia" needs correct diagnosis and treatment lest it develop into serious fulminating pre-eclampsia and then into eclampsia itself. At that point heroic measures may be necessary to head off the convulsive seizures that can result in death of the mother and/or loss of the fetus.
The danger signals of pre-eclampsia have been fairly well defined by past medical experience and might be basically summarized as follows:
1. High blood pressure (hypertension).
2. Edema (excessive retention of body fluids).
3. Proteinuria (excessive protein in the urine).
These danger signals are discernible during pregnancy through the generally standardized procedures of:
1. Regular blood pressure checks, starting with first visit.
2. Regular chronological weight history, starting with first visit.
3. Perodic urinalysis.
Any combination of these symptoms, or even one of them, could indicate a possibility of pre-eclampsia and the combination of all of them would indicate a strong probability of pre-eclampsia depending, of course, on the degree that each is out of the ordinary.
It is plaintiff's contention that at the time of Dr. Oms' examination of Mrs. Couto on the critical date, she was showing enough indications of the malady to have required more extensive and accurate testing for the specific danger signals of the disease. Plaintiff further contends that the recognized level of medical practice in the community was not adhered to by Dr. Oms due to his failure to test for these symptoms or danger signals in a clinically acceptable manner.
The procedure that was followed by Dr. Oms needs some reference point in order to consider the context in which his examination was conducted on December 14:
Dr. Oms was not seeing Mrs. Couto on a routine prenatal office visit. She had made a routine visit on November 23 and was advised to return early in December but apparently had not done so because the family was moving to a new home and she was busy. This particular visit was precipitated by the early morning fall and the resulting concern about the baby coupled with her neck injury. Since there was discomfort and soreness, Dr. Oms instructed his office assistant to administer a shot of "Talwin" (a pain reducing medication) which he felt would relieve the symptoms noted above. In addition to these procedures, he conducted a general examination, the sufficiency of which is seriously questioned by plaintiff. Specifically, he took Mrs. Couto's blood pressure and found it within reasonably normal limits; he stethoscopically checked the baby's heartbeat and found it satisfactory; and he made an analysis of her urine in a manner which might best be described as questionable. He did not weigh Mrs. Couto nor did he obtain a fresh urine sample from her but instead, smeared a multipurpose urinalysis "dipstick" in her vagina which he found to be quite moista condition that is not unusual in that stage of pregnancy.
The last described procedure was the target of a strong attack by plaintiff's experts. The general thrust of their testimony was that no satisfactory indication of the amount of protein in the urine could be correctly ascertained using this procedure.[1] They also seriously questioned the basis upon which Dr. Oms concluded that the moist condition was due to involuntary release of urine.
*524 The extent, scope, methodology, completeness and effectiveness of Dr. Oms' examination thus became an issue, or series of issues, for the jury to deliberate. Although we do not necessarily conclude that the procedure followed by Dr. Oms in the circumstances of his examination of Mrs. Couto constituted actionable negligence or failure to conform to established community standards we recognize, again, that factual and credibility issues do exist and there is evidence in the record to support a contrary conclusion.
Specifically, we observe that there is some evidence supportive of plaintiff's position. Defendant's contention that some of plaintiff's experts were litigation oriented and litigation involved so that their collective expertise seems to center, in actual practice, more in the courtroom than in the hospital may have been seriously considered and dealt with by the jury, who according to the mandate within which we make our appellate review, have a presumptive superiority over us in the resolution of factual issues.
We do not find any basis in the record to support a jury conclusion that Mrs. Couto died as a result of improvidently prescribed or improperly administered "Talwin." Nor do we, in view of the general verdict, conclude that this aspect of the claim was the basis upon which the jury established liability. Thus, the entire "Talwin" aspect of the case is, essentially, moot as far as this appeal is concerned.
The "Talwin" aspect should here and now be laid to rest. It came into the case as a result of the cross-examination of defendant's expertDr. Sternberg. When asked his opinion of the cause of death, if not eclampsia, he theorized that the cause may have been an adverse reaction to Talwin. Thereafter, plaintiff offered evidence to show that the Talwin "package insert" contained certain warnings regarding the use of the medication under certain circumstances including instances of possible head (neck?) injuries which might contraindicate its use under such circumstances.
To complete our review, we specifically hold that the record does not support a plaintiff's verdict based upon any theory of improper, incorrect, negligent or unsatisfactory selection or administration of the "Talwin" shot prescribed by Dr. Oms and actually injected by his office assistant. Likewise, we specifically hold that the verdict of the jury is presumed by us to result from a finding of liability based upon the main thrust of plaintiff's casethat Dr. Oms failed to properly test for, diagnose and treat pre-eclampsia. The necessity for this somewhat arbitrary procedure on our part could have been obviated by a submission of interrogatories to the jury but that was not done. Neither side can be blamed for this. Each could have prepared and submitted proposed interrogatories which the trial judge may have used. None are in the record.[2] We work with what we have. The "Talwin" issue will not be the subject of any further consideration in this opinion.
We turn to a deliberation of the alleged errors most seriously complained of by appellant who charges us to consider those alleged errors singularly and collectively, and in juxtaposition with the "razor thin" margin of plaintiff's 9-3 verdict. We are also admonished by appellee to be constantly aware of the great weight that must be accorded to the jury verdict even if serious *525 error exists, if the record will ultimately support the verdict.
The appellant contends that the following serious areas of error exist:
(1) The admission, over strenuous objection, of the Jefferson Parish Coroner's "Day Record" and of the testimony of Mr. Leo Bergeron, an investigator with the Jefferson Parish Coroner's Office. This document and Bergeron's testimony indicated that Mrs. Couto experienced convulsions prior to death when such conclusion is completely based on hearsay and assumption at best;
(2) The more or less obvious signal to the jury by plaintiff's counsel that Dr. Oms had made a personal liability admission by reason of the settlement of his individual exposure;
(3) Certain allegedly prejudicial incidents personally involving two of the jurors who ultimately voted for the verdict;
(4) The constant reference in hypothetical question to plaintiff's expert witnesses to assumed facts that were not properly proven. Coupled with this alleged area of error is the added contention that the jury was not properly charged regarding the weight to be accorded the expert testimony of various witnesses (whose testimony was admitted after defense counsel's repeated objections were overruled) and, finally, the expert qualification of a registered nurse to challenge, as an expert, certain procedures followed by a physician;
(5) The clear abuse of discretion and obvious prejudicial attitude that is indicated in the amount awarded for loss of the eight month old fetus.
The matter involving the admissibility of the coroner's report and the testimony which was adduced from Bergeron in connection therewith is complex.
Bergeron was an investigator with the Jefferson Parish Coroner's Office. He became involved in this matter because Mr. Couto brought Mrs. Couto to Ochsner Foundation Hospital emergency room at approximately 8:00 p.m. on the evening of December 14. Since Mrs. Couto was dead on arrival at Ochsner Foundation Hospital the Jefferson Parish Coroner's Office was advised. Bergeron had the job of attending to the administrative paper work required by the Coroner's office but did not conduct the autopsy or participate in the medical aspects of the case in any way. In the course of completing the various forms that are part of his administrative duties, Bergeron filled in a blank space entitled "Circumstances of death." Included therein are the following sentences:
"The above deceased was 8 months pregnant. This was her 5th pregnancy, fell out of bed at 2:00 A.M. and was taken to Mercy Hospital. Family doctor did not practice there, was consulted by phone and was told to take patient to his office at 3:00 P.M. Dr. Louis Oms gave patient shot, and said she would sleep, was taken home. Went into convulsion, was taken to Ochsner Foundation Hospital by ambulance and was dead upon arrival and no heart beat on fetus. No need for section. Body moved to West Jefferson General Hospital Morgue for autopsy."
(Emphasis ours)
Under the same general heading is a subheading entitled "Anatomical Diagnosis." Bergeron apparently filled that in (after the autopsy was actually conducted) in the following manner:
"1. Acute cerebral edemapatchy atelectlasis of lungs, congestion of liver, spleen and kidneys. Intrauterine pregnancy (3rd Tri) Eclampsia (pending histological exam. of tissue)."
When the autopsy was performed at West Jefferson Hospital morgue on December 15, 1970, Dr. T. K. Farris made *526 certain entries under the heading "ANATOMICAL DIAGNOSIS" as follows:
"#1. ACUTE CEREBRAL EDEMA
#2. Patchy atelectasis of lungs
#3. Congestion of liver, spleen and kidneys
#4. Intrauterine pregnancy (3rd Tri)
#5. ECLAMPSIA (pending histological exam, of tissue)."
In each instance, the notation "eclampsia" is followed by the parenthetical observation "pending histological exam, of tissue."
In a section of the autopsy reported entitled "FINAL NOTE" the following observation is made: "The histological findings in the tissue are consistent with eclampsia. The findings, however, are not diagnostic and are non specific."
The critical issues that are raised here are not with respect to the conclusions that were reached by Dr. Farris whom plaintiff had every right to call as a witness to support his autopsy report. Nor are they with respect to Mr. Bergeron's right to testify concerning routine preparation of certain administrative records maintained in the coroner's office. The issues are whether or not there was any competent admissible evidence to support the written notation by Bergeron that Mrs. Couto "went into convulsion" since the notation is not itself admissible and accordingly, whether or not defense counsel's timely objections to the testimony and the document should have been sustained. The mere fact that some conclusive notation is included in the "DAY RECORD" of the coroner's office (the form filled out by Bergeron) is not competent evidence of that entry.
The coroner's office form, or "DAY RECORD," is actually nothing more or less than Bergeron's compilation of data resulting from conversations with persons he was not even able to identify. He never saw Mrs. Couto alive or dead and never conversed directly with any member of the Couto family on a face-toface basis. His only contact with Mr. Couto was through a telephone conversation incident to his administratively completing the above described form.
Nevertheless, over defense counsel's strenuous and repeated objections, the trial court permitted the unrestricted introduction of the document in question and also permitted extensive testimony from Bergeron regarding the document and the entries made thereupon. It is interesting to note that the document entitled "DAY RECORD," though filled out by Bergeron, is actually signed by a Dr. George M. Bodron. Yet the document, P-13, was offered, introduced, filed (and admitted) into evidence by plaintiff's counsel at the conclusion of Mr. Bergeron's testimony. Dr. Bodron was not called to testify.
Courts have often commented on the introduction into evidence of coroner's report and have systematically condemned their admissibility as competent evidence to prove cause of death:
"In Faulk v. Mutual Life Insurance Co., 160 La. 529, 107 So. 395, 398, the Supreme Court, quoting with approval a previous decision and other authorities, says: `The formal report of a coroner's jury is at best but the weakest kind of evidence * * * and, "by the weight of authority, however, while such verdict is competent to be received in evidence as part of the proof that the death occurred, it is not even prima facie competent as tending to prove the cause of such death; and this is true when it is introduced by either party."` The same holding was made in Webster v. New York Life Insurance Co., 160 La. 854, 107 So. 599." *527 Johnson v. Sundbery, 150 So. 299 (La. App.1933). Speaking to this same subject, see 21 A.L.R.3d 418, 428:
"In the following death actions a death certificate entry as to the manner of circumstances producing the fatal illness, disease, or other condition has been deemed incompetent proof of causation, the courts so holding emphasizing the hearsay nature of such evidence.
* * * * * *

"La.Johnson v. Sundbery (1933, La. App.) 150 So. 299."
Also see: Franklin v. Old Colony Insurance Company, 150 So.2d 892 (La.App. 4th Cir. 1963); Brooks v. Washington National Life Insurance Co., 79 So.2d 653 (La. App. 4th Cir. 1955).
No instructions were given to the jury to temper in any way the effect of unqualifiedly admitting not only the document but also the lay testimony of Bergeron relative to convulsion.
There was little basis upon which the jury could have concluded that Mrs. Couto experienced convulsions were it not for the testimony and evidence noted above. Nevertheless, one of the cornerstones of plaintiff's case, consistently referred to in the hypothetical examples presented to the various experts, is the observation that Mrs. Couto experienced convulsions prior to death. Furthermore, there is general agreement among the experts that one of the ultimate hallmarks of eclampsia is convulsion.
The conflicting testimony of Mr. Couto and Miss Couto descriptive of Mrs. Couto's behavior in the course of the automobile ride from Dr. Oms' office to the Couto home is not supportive of a finding that she was, at that time, in convulsion. Standing alone this testimony would not be sufficient to have supported such a conclusion. Incidentally, there is no testimony supporting a conclusion that Mrs. Couto was convulsing at any time where such knowledge could have been imparted to Dr. Oms.
Did the admission of the above described evidence and testimony improperly and prejudicially bolster the order of proof put before the jury on this critical issue? We believe that it did. Was it possible for the jury to conclude that Mrs. Couto's death resulted from eclampsia without this critical link? Possibly, we believe, but most unlikely.
In the course of this extended trial, various incidents occurred which, defendant contends, had the effect of compromising the jury. Both individual instances and general circumstances are cited to us for our consideration and deliberation.
It is sufficient for the purpose of this appellate review to state that we do not find any specific instance, that directly caused any of the jurors to calculatedly or intentionally reach a result or a conclusion that he did not believe was supported by the evidence. In other words, we do not find that any juror, because of any particular or specific incident, compromised or altered his verdict due to any calculated, prejudicial response on his part. However, we do conclude that the overall handling of the evidence relative to Dr. Oms' individual release from liability gives validity to defendant's contention that the jury was made aware of the fact that Dr. Oms had apparently settled his individual responsibility (if any he had) with Mr. Couto.[3] This, of course, leads inevitably to the next conclusion which is best described as a rhetorical question in the jury's mind:
*528 "Why did Dr. Oms settle personally with the plaintiff if he wasn't convinced, in his own thinking, that his negligence caused the death of Mrs. Couto?"
In fairness to the appellee, a careful examination of this record reveals no actual overt, specific, clear-cut indication of settlement. Accordingly, there could be a valid difference of opinion as to whether or not the kind of disclosures that are clear in the record are sufficiently obvious to have constituted a clear signal to the jury that a settlement (with all of the implications attendant thereupon) had positively been made. Furthermore, it is just possible to conclude that although the jury might have considered that a settlement was made they could, nevertheless, also have concluded that such settlement was not necessarily indicative of liability but only an acknowledgment of the possibility of exposure under the circumstances. Thus, they could have determined that a sort of "business decision" was made by Dr. Oms after measuring the possibility of exposure against the cost of defense and the attendant mental turmoil and anguish even though there was no personal acknowledgment of liability. We do not think the jury was this discerning but there is a possibility that it could have been and were there no other prejudicial circumstances except those which have been described in connection with the settlement to indicate error, we would not, on this alone, set the judgment aside.
With regard to those plaintiff's expert witnesses who were out-of-state non-Louisiana-licensed physicians, we conclude that the trial court did not abused its discretion in permitting them to testify with respect to the standard of care in this locale, however, a specific protective charge should have been given by the court to categorically delineate the difference between the weight that could be accorded to a local practitioner and a doctor from out-ofstate with no actual experience regarding local standards of care. It was imperative that it be made clear to the jury that the weight (if any) to be given such evidence must be commensurate with their finding as to that doctor's particular familiarity (or lack thereof) with standards of local practice. If the local experience requirement is to be removed in ruling on admissibility of this type testimony in malpractice litigation, some clear safeguard, over and above the general charge regarding experts, must be given.
The trial judge consistently overruled specific defense objections to the admissibility of the expert testimony of the out-of-state non-Louisiana-licensed physicians. This action created a presumptive obligation to specifically charge the jury in the manner generally noted above. It is highly questionable that a non-local physician can become expertly conversant with local standards of practice by attending conventions or reading journals. The very fact that the "locality rule" has, until now, existed in our Louisiana law [See: Meyer v. St. Paul Mercury Underwriters Company, 225 La. 618, 73 So.2d 781 (1954)], should have been a clear indication to the trial judge that its applicability can not be disregarded without a clear instruction to the jury. The ultimate effect of this type of expert testimony on the litigation demands that it be tempered by a jury determination of the weightif anyto be accorded to it in the unusual circumstances of it being admitted at all. If the trial court chose to distinguish Meyer v. St. Paul and overrule defense counsel's objections to the admissibility of the testimony of plaintiff's out-of-state experts because of their attendance at conventions here or their own self-serving assumptions that obstetrical care standards were all similar or identical throughout the country, then at the very least, the jury should have been specially charged to consider the weight and sufficiency of the proof of plaintiff's contended exceptions to the Meyer case locality rule.
*529 This same general reasoning should apply to the "standard of care" inquiry. A local, board certified clinical pathologist, tendered and accepted as an expert, may, we acknowledge, be permitted to testify about current obstetrical practices in the community under certain circumstances. In this case that particular doctor's last rendered obstetrical care was over sixteen years prior to trial. The court accepted him as an expert in "general standards of care for the general practice in this community whether they be general practitioner or obstetrician for the general standards of care and the general handling of obstetrical patients not with regard to OB GYN handling of a complicated case, OB GYN problem." The court overruled defense counsel's objection to his qualification as an obstetrical expert. Defense counsel had stipulated his willingness to accept the physician as an expert in the field of clinical pathology. Although such action by the court may not constitute error it does, at least, set up the presumptive obligation to specially charge the jury regarding the weight (if any) accorded such testimony and a refusal to specially charge the jury on this specific point is a serious deficiency. Does the general expert witness charge that was given suffice? Possibly so in this instance, but it is clearly insufficient in connection with the locality rule situation discussed in the preceding paragraphs.[4]
The hypothetical questions asked plaintiff's expert placed considerable emphasis on a telephone call by Mr. Couto to Dr. Oms informing him of the distress that Mrs. Couto was allegedly experiencing at about 5:30 in the afternoon. Mr. Couto, however, fails to recall any communication of his wife's symptoms at that time to Dr. Oms. Yet, the hypothetical questions relentlessly contained the implication, and, in most of them the definite contention, that Dr. Oms had a clear late afternoon indication of Mrs. Couto's deepening distress. Except for Dr. Oms himself acknowledging that he did receive a brief call late in the day there is no evidence of one having taken place. If plaintiff who, himself, denies any call at that time to Dr. Oms, nevertheless heavily depends on the existence of the alleged call as a line in his chain of proof, he is certainly bound by Dr. Oms' description of that call. The doctor says that the call brought only the information that Mrs. Couto had awakened and was still complaining of neck discomfort.
Let us examine the record on this critical point.
Mr. Couto, in answer to defense counsel's specific question about the 5:30 *530 call states: "I never made the telephone call." Asked if any call was made to Dr. Oms which described any symptoms between the time Mrs. Couto was brought home from Dr. Oms' office and the time of her death Mr. Couto stated "Nobody called." Asked again "Nobody called Dr. Oms?" he replied, again, "Nobody called."
In his opening statement plaintiff's counsel told the jury that he would prove that Mr. Couto called Dr. Oms around 5:30 p. m. and reported her thrashing in bed with foam coming from her mouth. In many of the hypothetical questions put to the experts, plaintiff's counsel makes reference to Mr. Couto's telephone call of 5:30 to Dr. Oms in which he variously described his wife as "jerking in the bed," "foam coming from her mouth," "very sick," "in great pain," asking that Dr. Oms "please do something," "frothing from the mouth," "jerking around in bed," etc., etc.
The record does not support this, yet it all appears in various forms throughout the hypothetical interrogation of plaintiff's experts and clearly forms a cornerstone for many of their conclusions.
Not only was this seriously damaging to the validity and acceptability of the testimony of those experts but its constant repetition before the jury in the form of hypothetical questions could not help but severely damage the jury's objectivity. We are all aware of the subtle effects of a consistently repeated statement in terms of its ultimate acceptance as fact even when it is not a fact. We find that the procedure followed here not only impaired the acceptability of plaintiff's experts' testimony but also, since it was totally without factual basis, adversely affected the jury's objective consideration and their ultimate determination. We believe that the constant referral to non-established "facts" did critical damage. It compromised the expert testimony and it caused the jury to consider the "facts" as established even though they clearly were not. Perhaps this was effectively discussed in closing arguments by defense counsel but, at any rate, the damage had already been done.
In Dowling v. Mutual Life Insurance Co. of New York, 168 So.2d 107 (La.App. 4th Cir. 1964) this court held that where there was no factual basis for hypothetical questions put to a witness (and dealt with in the jury charge) error prejudicial to plaintiff was committed. We likewise hold that it was error prejudicial to defendant here to permit a plethora of hypotheticals on extremely sensitive points without factual basis.[5]

SUMMARY AND CONCLUSION
We find sufficiently serious areas of error in the conduct of the trial to conclude that the jury's verdict should not be allowed to stand. We cannot affirm a result that is reached in a climate of such harmful error.
*531 Major among the errors which lead to our conclusion are:
The admitting into evidence of the coroner's day record with the report Mrs. Couto went into convulsion and the investigator's testimony to the same effect;
The allowing of plaintiff's medical experts to characterize Dr. Oms' treatment as below the local standards for medical practice; and
The reference by plaintiff's counsel in hypotheticals and arguments to a telephone call made by Mr. Couto to Dr. Oms shortly before Mrs. Couto's death.
Critical to our consideration is whether or not these major errors individually and/or collectively constituted prejudicial error with the far reaching consequence of remanding this case for a new trial considering the burden being thrust upon plaintiff, who has already borne the expense and strain of a protracted and complex trial. It is this practical consideration which dictates that appellate review of any jury trial should be exercised with great restraint. With this firmly in mind and considering the legal principles which govern the scope of our review we are compelled to the same conclusion stated above.
In Naquin v. Maryland Casualty Company, 311 So.2d 48, the court enumerated the following principles:
"When a review of the record indicates the trial court judgment is correct and that justice has been done, the judgment will not be overturned because of errors which did not affect the merits. LSA-C.C.P. 2164; Shows v. Williamson, 256 So.2d 688 (La.App. 2 Cir. 1972). When error is detected, it must be weighed to determine whether such error is harmless or prejudicial. Lauro v. Travelers Insurance Company, 261 So.2d 261 (La. App. 4 Cir. 1972). When there is evidence before the trier of fact which, upon reasonable evaluation, furnishes a factual basis for the trial court's finding, the appellate court, on review, should not disturb this factual finding absent manifest error. Canter v. Koehring Company, 283 So.2d 716 (La.1973)."
In the application of these principles the question becomes whether or not the evidence is sufficient to support the jury's verdict notwithstanding the presence of the errors in the record. The discussion then develops into sub parts, first, if there is evidence at all to support the essential elements of plaintiff's case; second, in those instances where there was conflicting evidence on essential elements as in the case of some of the expert opinions, whether or not the jury's resolution of such conflicts was accomplished fairly and reasonably, where the atmosphere of the trial was so contaminated by error that such a fair and reasonable resolution cannot be presumed; and, third, if we are in a position to make a reasonable evaluation of conflicting testimony so as to resolve conflicts simply because we have disregarded inadmissible evidence and avoided the errors.
The essential factual elements of plaintiff's case are 1) that Mrs. Couto died of eclampsia, and 2) that had Dr. Oms acted as a reasonably prudent person, treating his patient in distress, he would have discovered that she was in a pre-eclamptic stage and thereby been led to take appropriate action in order to prevent the condition from progressing.
The critical element of proof that Mrs. Couto died of eclampsia is that she did in fact have one or more convulsions prior to her death. There is general agreement among the experts that one of the ultimate hallmarks of eclampsia is convulsion. Dr. Farris, whose testimony should be accorded considerable weight, since he performed the autopsy and had first-hand knowledge of the anatomical findings, was emphatic in his opinion that diagnosis of eclampsia could not be made *532 absent evidence of convulsions. Plaintiff's proof that Mrs. Couto suffered convulsion prior to her death consisted of the coroner's day record and the testimony of the coroner's investigator, the testimony of the lay person, Mr. Couto, his sister and his daughter who were with Mrs. Couto at the time of or shortly before her death, and the testimony of Dr. Bruce Jarvis who interpreted anatomical findings on autopsy to indicate that she had convulsed before death.
With respect to the first of these three, namely, the coroner's day record and the investigator's testimony, this evidence was absolutely inadmissible and prejudicial to defendant's case. But, ignoring this testimony, full consideration and close scrutiny of the testimony of the three relatives of Mrs. Couto should be made to determine whether it supports a conclusion that she convulsed before death. None of these witnesses professed to have any first-hand knowledge of convulsions and their testimony as to what they saw can only be considered in the light of the definitions for convulsion available to us. The only medical witness who defined convulsion was defendant's expert, Dr. Jack Kushner, who said, "Convulsion is an act of violent contractions of the muscle. It can be described as minor convulsions or major. In major convulsions, all extremities are jerked forward; the body contracts and is what the popular expression is that he threw a fit. That's a convulsion. Fits and convulsion are the same . . ."
A medical textbook referred to as the Greenhill Report during trial describes convulsion as follows: "There are violent intermittent contractions of the muscles of the head, limbs and trunk, and saliva, tinged with blood when the tongue has been bitten, covers the lips."
Mr. Couto gave no testimony to describe any such condition shortly before his wife's death, saying only that she lapsed into a coma when she got home. Mrs. Couto's sister-in-law, a Mrs. Demello, testified only that when Mrs. Couto got home "she didn't wake up . . . and later she tried to move and have a lot of saliva start from the mouth . . . her nails were purple and her lips were purple." While answering in the affirmative a direct question, "was this a little bit [of saliva from her mouth] when she finally convulsed at the end," she did not testify that Mrs. Couto was jerking in her bed when she died and that she moved only immediately before dying.
The foregoing should not be considered without regard to the same witnesses' testimony as to Mrs. Couto's behavior in the automobile after she was taken from Dr. Oms' office and brought to her home. Mr. Couto said that his wife acted "like a crazy woman" before lapsing into a coma. Mrs. Demello said that she jumped, but, had to be held, and screamed, and the daughter said that her mother was kicking, waving her arms and jerking in the automobile.
This testimony, taken at face value, could, perhaps, fit the definitions of convulsion available to us. However there is much medical testimony in the record which absolutely refutes this conclusion. Furthermore, the testimony of the three Couto relatives concerning Mrs. Couto's behavior just after she left Dr. Oms' office is in total direct conflict with that of Dr. Oms and his employees who witnessed no such bizarre behavior.
The conclusion that Mrs. Couto convulsed before her death was reached by Dr. Jarvis based upon anatomical findings on autopsy, but his testimony was flatly contradicted by Dr. William Sternberg who was of the firm opinion that none of the anatomical findings on autopsy indicated convulsions. Neither did Dr. Farris conclude convulsions from his autopsy alone. All of these physicians were experienced pathologists with impressive credentials.
Thus, there is some evidence in the record tending to support a finding of convulsion *533 before death but the evidence is very conflicting on the point. Had it not been for the influence on the minds of the jurors as a result of the errors made during the trial, would they have made the same resolution of the conflict in testimony between the members of the family on the one hand, and Dr. Oms and his personnel on the other, or would they have made the same evaluation of the opinions of Drs. Jarvis, Sternberg and Farris? It is certainly not necessarily so, and in all probability the jurors' mental process would have been substantially altered without the errors. We can insulate ourselves from the errors but are clearly not in a position to then make a reasonable evaluation of these facts. We cannot say that one set of witnesses spoke the truth while the other set lied. Nor can we accept the opinion of Dr. Jarvis and reject that of the other two pathologists.
Thus, we conclude that the record does not support a finding that Mrs. Couto convulsed and died of eclampsia.
Having reached that conclusion, it might be superfluous to consider whether the record supports a finding that Dr. Oms was negligent in failing to diagnose and treat Mrs. Couto for eclampsia.
In addition to the symptoms previously discussed, it is clear that visual distress may be a significant sign of impending eclampsia. When Mrs. Couto was in the Mercy Hospital emergency room the note was made that: "Patient complaining of being unable to see wellcan't focus eyes."
While the Mercy Hospital personnel had no independent recollection of the case it is clear that they ascertained this information during their examination which was completed at about 1:00 p. m. But Dr. Oms, who saw her at about 2:00 p. m., testified that he was never aware of this problem. He says nobody told him about it and he did not discover it although he examined Mrs. Couto's pupils. His testimony is corroborated by that of his nurse.
Mr. Couto testified that he spoke to Dr. Oms from the hospital and told him she could not see, that on the way to Dr. Oms' office she still "no see," and that he again told Dr. Oms about this in his office. Mrs. Demello testified that Mrs. Couto could not see on the way to and at Dr. Oms' office. But Mrs. Couto's daughter testified that when they got to Dr. Oms' office her mother was not complaining that she could not see.
Thus, a serious conflict emerged. Was Mrs. Couto still experiencing visual distress at all when she got to Dr. Oms' office? Did she complain to Dr. Oms about this condition? We can only infer that she was having visual distress at Mercy Hospital because she complained about it there. We have no evidence that this condition was demonstrated on physical examination at the hospital. We have no evidence that a reasonable examination would have disclosed this condition if it existed at all in Dr. Oms' office. To conclude that Dr. Oms was negligent in failing to learn of this condition would therefore require that Mr. Couto and Mrs. Demello be believed, Dr. Oms and his nurse be disbelieved and the testimony of Mrs. Couto's daughter be ignored. We are unable to say that the jury would have so concluded in the absence of the major errors previously discussed and as appellate judges we cannot make such a determination.
Finally, even if we are convinced that Dr. Oms should have made a differential diagnosis of eclampsia and therefore he should have taken her blood pressure (which he did and which was normal), should have made a proper urinalysis and should have weighed her to check for occult edema, since there is insufficient proof that she died of eclampsia there can be no causal connection between her death and Dr. Oms' failure to analyze her urine and her weight. We cannot infer that she had excessive protein in her urine or occult edema from Dr. Oms' failure to test. We might make such inferences if we knew *534 she had impending eclampsia but this is not established in the record.
The judgment of the Civil District Court for the Parish of Orleans is hereby annulled, and set aside. The case is remanded for a new trial on the merits. Costs in the court below and in this court to await determination of the final outcome of the litigation.
Annulled, set aside and remanded.
NOTES
[1] If the test had shown excessive protein in the urine one of the danger signals would have been confirmed.
[2] The record does make reference to a conference in the judge's chambers in the course of which defendant's counsel apparently expressed a desire to submit proposed jury interrogatories. This proposal was apparently not accepted by the trial judge. No written jury interrogatories were either marked for identification, proffered or offered as an exhibit by either side. The record contains only objections to various jury charges by both sides and the objection to the non-use of certain jury interrogatories by defense counsel.
[3] In the opening statement of plaintiff's counsel and in the course of conducting the voir dire the matter of the settlement (or evidence thereof) came up. The trial court obviously concerned, stated to the jury that the suit had originally commenced against both Dr. Oms individually and the insurance company but that the doctor was no longer a party to the suit "* * * because of some pleadings that I will explain to you." But no particular explanation of any pleadings was thereafter made.
[4] The informed and reasoned opinions of expertscorroborated by facts in the recordare, quite properly, important and persuasive in civil jury trials.

However, the introduction of such testimony carries with it certain responsibilities to the record. The trial judge and the trial attorneys have the joint obligation to protect the jury from according any greater significance to expert testimony than fairness dictates. This requires that the jury be fully and fairly instructed in the proper consideration of expert testimony including the weight it may be accorded in particular or unusual circumstances. And, as such testimony becomes more compelling in its effect, the more clearly this obligation exists.
The plaintiff's use of non-Louisiana-licensed physicians as experts denoted a clear departure from general expert witness procedure. This may have been acceptable if the trial judge had made very sure that such departure was specifically and categorically delineated to the jury so that it clearly understood its options to regard or disregard in view of this important added factor.
In other words, general instructions will not suffice for unusual circumstances. The general instructions concerning experts did not sufficiently cover the situation to permitwithout additional specific instructionsthe introduction of testimony from non-Louisianalicensed physicians.
Juries should have the full benefit of expert opinions in their deliberation but also must have the opportunity to intelligently temper such testimony by receiving a clear charge and clear instructions dealing directly with any factors that take such expert testimony out of the realm of the ordinary.
[5] The jury charge given by the trial court dealing with this issue begins: "Now the opinions of experts must alternately [sic] be based on facts." With minor typographical errors it is the standard charge dealing with expert testimony.

However, the standard charge was not sufficient to deal with the actual conditions existent in this trial. Counsel's unrestricted and constant reference to unproven facts in his myriad hypothetical questions brought about a requirement for more detailed and particularized explanation to the jury than a sentence in the standard charge on expert testimony.
Extensive tactical advocacy in protracted jury trials imposes a proportionately increased burden on the court to keep the jury from being misled.
The trial court should have either maintained far more careful control over the suggestive and persuasive use of factually unsupported hypothetical questions or materially expanded its instructions and warnings to the jury with respect thereto. Both would have been preferable. To do neither was to unintentionally encourage error.