**J. D. SAMUELS, Jr.**

v.

**DOCTORS HOSPITAL, INC., et al.,**

**American Motorists Insurance Company, Intervenor.**

**Civ. A. No. 750078.**

United States District Court, W. D. Louisiana, Shreveport Division.

June 16, 1976.

Addendum June 28, 1976.

William P. Hannon, Jr., Atlanta, Tex., Helm, Jones & Pletcher, Houston, Tex., Leonard Fuhrer, Neblett, Fuhrer & Broussard, Alexandria, La., for plaintiff.

T. P. Flahive, Flahive & Ogden, Austin, Tex., for intervenor.

Charles L. Mayer, Mayer, Smith & Roberts, James B. Gardner, Lunn, Irion, Switzer, Johnson & Salley, Sidney Earl Cook, Cook, Clark, Egan, Yancey & King, Shreveport, La., for defendants.

DAWKINS, Senior District Judge.

### MEMORANDUM RULING

J. D. Samuels, Jr., here seeks damages for personal injuries allegedly caused by the negligence of Dr. Warren Long, Dr. H. K. Faludi, and Doctors Hospital, Inc. (the Hospital). Also named as defendants were St. Paul Fire & Marine Insurance Company, insurer of Dr. Long, and Hartford Fire Insurance Company, insurer of Dr. Faludi. By order of the Court, predicated upon joint stipulation of the parties, plaintiff's individual claims against Dr. Long and Dr. Faludi have been dismissed, reserving all rights to plaintiff to proceed against the Hospital and the two insurers.

Jurisdiction is based upon diversity of citizenship. 28 U.S.C. § 1332.[1]

The complaint, answers, answers to interrogatories, depositions, and medical records in the file established the following uncontroverted facts:

While working for the Interstate Paper Company, at Queen City, Texas, in 1972, plaintiff fell from a machine, landing upright. Several days later he developed pain in the left hip, and this soon began to radiate down the left leg. Plaintiff was treated by Dr. Norris Knight, of Texarkana, Texas, who fitted him with a back brace. However, Samuels continued to experience discomfort, and a myelogram revealed a deep defect at L5, S1 on the left side. On December 17, 1972, plaintiff underwent a laminectomy at L5, S1 on the left, at Wadley Hospital, Texarkana, Texas (none of the records in the file shows by whom this surgery was performed). After his discharge from Wadley Hospital on December 26, 1972, plaintiff made out-patient visits to Dr. Knight tri-weekly. Soon the visits were reduced to once every three months, and plaintiff last saw Dr. Knight on January 9, 1974.

Immediately following his first laminectomy, plaintiff began to experience pain in the right hip, and again radicular pain soon followed, together with some parispinous muscle spasms in the right parispinous area. Samuels complained that, although sitting was less painful than standing and walking, he could assume no configuration which fully would alleviate his painful symptoms; he even felt pain while lying prone.

Dr. Knight sought neuro-surgical consultation with Dr. Warren Long in January, 1974. Dr. Long's consultation report, dated January 22, 1974, contains the following impression:

> "Recurrent HNP problems. I feel that this man should have a total hemi-laminectomy and disc removal at 4, 5, or

1. Mr. Samuels is a citizen of the State of Texas; this action now being a direct action, the insurance companies are citizens of the State of Louisiana, the State of citizenship of their insured; the sum in controversy exceeds $10,000 exclusive of interest and costs. 28 U.S.C. § 1332(c).

St. Paul has brought a third party complaint against Hartford; however, that is of no moment regarding the issues addressed by this ruling.

corresponding to the mid-line defect on the lateral myelogram and also exploration of the 5, 1 interspace or 5, 6 as it would be here on the right at the same time. I have talked to Dr. Knight about this."

Samuels entered Doctors Hospital on January 27, 1974; he was scheduled for surgery which was performed the following day. Dr. Long's report of the operation is unremarkable: "The intervertebral disc at L4–5 right was removed and Samuels was returned to the recovery room in satisfactory condition."[2]

Since Dr. Long planned to be out of town for several days, he asked Dr. H. K. Faludi to "cover" for him on Friday and Saturday. Dr. Faludi testified at his deposition that Dr. Long must have left Shreveport on Thursday, January 31, because several nurses called him late that afternoon to request instructions regarding several of Dr. Long's patients.

Dr. Long returned to Shreveport on Sunday, February 3, which was six days into plaintiff's postoperative period.[3] Samuels then had developed total paraplegia with sensory level at L–1. He was taken to the x-ray room where a lumbar puncture was performed. Pus exudate was found in the subdural space, and a tap of the epidural space revealed the presence of still more exudates. A red Number 8 French Catheter was inserted in the epidural space all the way to T–1, and the space thoroughly was irrigated with Bacitracin solution. Medical reports in the record show that the greatest mass of exudates was at the site of the laminectomy, 4–5, 5–1 right. Additionally, there was a small dural tear at the 4–5 right interspace.

Dr. Long scheduled and performed surgery that day. His report of surgery shows that a total laminectomy was performed at 5–4–3–2 and portions of 1. The wound thoroughly was cleansed, and two large tubes were placed bilaterally in the gutter wall, and a reverse flow irrigation was set up. The pathologist's report, filed February 3, reads in part as follows:

"DIAGNOSIS: Epidural tissue:

1. Acute cellulitis of fibrofatty tissue with associated bacteria of micrococcal morphology. Hemolytic coagulase positive Staphylococcus aureus cultured."

In laymen's terms, this simply means that plaintiff suffered an epidural tissue abscess caused by a Staphylococcus infection.

Plaintiff contends that the infection has rendered him a life-long paraplegic. He further contends that the infection was caused by the negligence of Dr. Warren Long and the Hospital in the respects set forth in the complaint. In the alternative, Samuels contends that the Hospital should be liable under a theory of res ispa loquitur. Finally, plaintiff avers that Dr. Faludi also was negligent in failing timely to detect the onset of the disabling Staphylococcus infection while treating plaintiff in the absence of Dr. Long.

In his supplemental answers to interrogatories propounded by the Hospital, plaintiff lists the several expert witnesses whom he expects to call at trial. Those "will call" witnesses who were listed to testify regarding failure to follow recognized medical procedures are Dr. Gerald F. Winkler and Dr. Robert M. Crowell,[4] both of whom are from Great Neck, New York. Accordingly, on March 11, 1976, we ordered the attorneys for all parties to file memoranda on the question of admissibility vel non of opinion testimony by Doctors who are not licensed to practice medicine in Louisiana, and, more particularly, in Shreveport. We directed the attention of the parties to Couto v. Oms, 319 So.2d 518, at 528 (La.App. 4th Cir., 1975). Defendants subsequently moved to exclude the testimony of plaintiff's nonresident experts on the liability question at trial. We realize that this motion may be

2. Report of operation prepared by Dr. Warren Long, January 28, 1974.

3. The myriad of facts regarding Dr. Faludi's treatment of plaintiff in Dr. Long's absence

need not here be recited for purposes of this ruling.

4. Dr. Crowell subsequently was replaced by Dr. James Wepsic.

premature; however, we also are aware that a delay in resolving this issue may result in considerable expense for travel and expert witness fees. Consequently, all parties are in agreement that we presently should rule on defendants' motion.

The sole issue now before us, therefore, is the admissibility *vel non* of opinion testimony, offered to prove liability, by doctors who are not licensed to practice medicine in Louisiana.

Plaintiff contends that opinion testimony of out-of-state physicians is admissible, and any objection thereto should go only to the weight to be given to the testimony. Plaintiff tenders three arguments in support of his contention:

First: It is within the province of the jury to determine, after direct and cross examination, whether the out-of-state physicians have any knowledge of local community standards;

Second: The local standards may not meet generally acceptable medical standards (to which these doctors may testify), thus local standards may be immaterial on the negligence issue, *Favalora v. Aetna Casualty & Surety Company,* 144 So.2d 544 (La.App. 1st Cir., 1962); and,

Third: Defendants' testimony on cross examination should be compared to "other testimony as to the standard which should be applied in communities of similar size and location." [5]

Defendants argue that the long established "locality rule," together with the newly adopted Louisiana Medical Malpractice Statute, requires that opinion testimony by doctors who are not licensed to practice medicine in Louisiana be held inadmissible *per se.*

We note initially that Louisiana's recent codification of the jurisprudential "locality rule," La.R.S. 9:2794 (Acts 1975, No. 807, § 1), does not control this controversy, for the statute was passed after the occurrence of events which led to this law suit.

The most oft-quoted phraseology of the "locality rule" appears in *Meyer v. St. Paul-Mercury Indemnity Company,* 225 La. 618, 73 So.2d 781 (1953).[6] The Court there stated:

"A physician, surgeon or dentist . . . is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the *same* community or locality, and to use reasonable care and diligence, along with his best judgment in the application of his skill to the case." *Meyer v. St. Paul-Mercury Indemnity Company, supra,* 73 So.2d at 782. (Emphasis supplied.)

The locality rule was not an issue in *Meyer;* however, the rule was expressed as part of the standard of care to which physicians must be held. The Supreme Court of Louisiana fairly recently reaffirmed the locality rule in *Uter v. Bone and Joint Clinic,* 249 La. 851, 192 So.2d 100 (1966). Likewise, the Courts of Appeal of Louisiana (intermediate appellate courts) continue to employ the locality rule as the proper standard of care in medical malpractice cases. See *e. g., Delaune v. Davis,* 316 So.2d 7 (La.App. 1st Cir., 1975); *Glenn v. Kerlin,* 305 So.2d 611 (La.App. 2d Cir., 1974); *Busby v. St. Paul Fire & Marine Insurance Company,* 290 So.2d 701 (La.App. 1st Cir., 1974). Moreover, required applicability of the locality rule specifically has been recognized by the United States Court of Appeals for the Fifth Circuit. *Davis v. Duplantis,* 448 F.2d 918 (5th Cir., 1971). That Court held:

"To recover in a malpractice case, plaintiff has the dual burden of proving first, the recognized standard of care generally practiced by other physicians in the community in similar situations, and second,

---

**5.** Plaintiff's memorandum on admissibility of nonresident physician's testimony, pursuant to Court order, *supra.*

**6.** The true forerunner of the present locality standard was *Roark v. Peters,* 162 La. 111, 110 So. 106 (2d Cir., 1926). The standard there expressed was rephrased in *Meyer, supra.*

that the defendant negligently failed to follow that standard." *Davis v. Duplantis, supra,* at 920.

See also *e. g., Thompson v. United States,* 368 F.Supp. 466 (W.D.La., 1973); *Frederic v. United States,* 246 F.Supp. 368 (E.D.La., 1965); *George v. Phoenix Insurance Company,* 215 F.Supp. 340 (E.D.La., 1963), affd. 328 F.2d 430 (5th Cir., 1964).

■ Thus it appears settled that a defendant physician (or his insurer) in a malpractice action in a diversity case wherein Louisiana law must be applied shall be held to the standard of care ordinarily exercised by other physicians under similar circumstances *in the same community.*[7] While the rule slightly has been relaxed at times,[8] the same locality standard cannot be stretched to encompass the northeastern United States.

However, the Civil District Court (trial court), Parish of Orleans, recently permitted out-of-state physicians, called as plaintiff's experts, to testify regarding liability of a New Orleans obstetrician. In reversing the trial court, the Louisiana Court of Appeal for the Fourth Circuit observed:

"With regard to those plaintiff's expert witnesses who were out-of-state non-Louisiana-licensed physicians, we conclude that the trial court did not abuse its discretion in permitting them to testify with respect to the standard of care in this locale, however, a specific protective charge should have been given by the court to categorically delineate the difference between the weight that could be accorded to a local practitioner and a doctor from out-of-state with no actual experience regarding local standards of care. It was imperative that it be made

clear to the jury that the weight (if any) to be given such evidence must be commensurate with their finding as to that doctor's particular familiarity (or lack thereof) with standards of local practice. If the local experience requirement is to be removed in ruling on admissibility of this type testimony in malpractice litigation, some clear safeguard, over and above the general charge regarding experts, must be given." *Couto v. Oms,* 319 So.2d 518, at 528 (La.App. 4th Cir., 1975).

Plaintiff's application for writ of certiorari was granted by the Supreme Court of Louisiana, 323 So.2d 128 (La., 1976), and in that order the case was remanded to the Court of Appeal for decision on the merits. On remand, the Court of Appeal, in an opinion not yet reported, rendered judgment on the merits for defendant.[9]

While the above-quoted language from *Couto* appears to countenance nonresident physicians' testimony accompanied by a cautionary instruction to the jury, other language in the initial appellate opinion casts doubt on the admissibility *vel non* of that testimony. That Court observed:

"It is highly questionable that a non-local physician can become expertly conversant with local standards of practice by attending conventions or reading journals. The very fact that the 'locality rule' has, until now, existed in our Louisiana law [See: *Meyer v. St. Paul Mercury Underwriters Company,* 225 La. 618, 73 So.2d 781 (1954)], should have been a clear indication to the trial judge that its applicability can not be disregarded without a clear instruction to the jury. The ultimate effect of this type of expert testimony on the litigation demands that it be

---

7. Louisiana now plainly is in the minority in failing to apply the standard of care exercised by physicians in "similar localities" or "geographic areas" within which there were similar opportunities for experience and the accumulation of medical knowledge. See Comment: *The Medical Malpractice Action in Louisiana,* 33 La.L.Rev. 420, at 425–426.

8. In *Uter v. Bone and Joint Clinic, supra,* a New Orleans physician testified as to the standard of practice in the Baton Rouge community.

However, the New Orleans physician may well have been acquainted with the standards of care employed in the Baton Rouge area since the communities are only eighty miles apart.

9. The memorandum filed by counsel for Dr. Long and St. Paul Fire & Marine Insurance Company states that the remand opinion and judgment of the Court of Appeal do not address the question of nonresident physicians' testimony on the issue of liability.

tempered by a jury determination of the weight—if any—to be accorded to it in the *unusual circumstances of it being admitted at all." Couto v. Oms, supra,* 319 So.2d at 528. (Emphasis supplied.)

"The plaintiff's use of non-Louisiana-licensed physicians as experts denoted *a clear departure from general expert witness procedure.* This *may have been acceptable* if the trial judge had made very sure that such departure was specifically and categorically delineated to the jury so that it clearly understood its options to regard or disregard in view of this important added factor." *Couto v. Oms, supra,* 319 So.2d at 529, footnote 4. (Emphasis supplied.)

In *Charouleau v. Charity Hospital of Louisiana at New Orleans,* 319 So.2d 464 (La. App., 1975), writ den. 323 So.2d 137 (La. 1975), decided six days after *Couto v. Oms, supra,* the same Louisiana Court of Appeal for the Fourth Circuit upheld a decision of the trial court to refuse to permit a physician who did not reside or practice medicine in the area of Charity Hospital to testify regarding local community standards at Charity at the time of the suicide of plaintiff's decedent. The Court held:

" * * * The 'locality rule' places upon a hospital the duty to exercise the degree of care, skill and diligence used by hospitals generally in that community. *Lauro v. Travelers Insurance Company,* 261 So.2d 261 (La.App. 4 Cir., 1972). . . . Dr. Diamond did not reside in the New Orleans area nor was he practicing medicine in this area. Dr. Diamond was *incompetent* to testify as to local community hospital standards at the time of Mrs. Charouleau's death. The trial judge's refusal to admit his testimony was correct." 319 So.2d 464, at 468 (Emphasis supplied.)

This language compels us carefully to consider Rule 601 F.R.E., which provides:

"Every person is competent to be a witness except as otherwise provided in these rules. However, in civil actions and proceedings, with respect to an element of a claim or a defense as to which state law supplies the rule of decision, the com-petency of a witness shall be determined in accordance with State law."

Thus, if the *Charouleau* decision properly states the law of Louisiana, the nonresident physicians with whom we presently are concerned are incompetent to testify, since neither has lived in the Shreveport, Louisiana, area, or practiced medicine here. On the other hand, if the *Couto* case correctly states Louisiana law, we may receive the testimony of these nonresident physicians, together with clear and concise cautionary instructions to the jury in accord with the quoted portions of *Couto, supra.*

■ We neither have been shown, nor are we aware of, any decision wherein the Supreme Court of Louisiana has addressed the question presently before us. Accordingly, we "must apply what [we] find to be the state law after giving 'proper regard' to relevant rulings of other courts of the state. In this respect, [we] may be said to be, in effect, sitting as a state court." *Commissioner v. Estate of Bosch,* 387 U.S. 456 at 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967).

In view of Louisiana's strict adherence to the "locality rule," we believe the *Charouleau* result better insures that a defendant in a malpractice action will be held to the knowledge, skill, and standard of care of members in good standing of the profession in the same locality or community. Further, we are persuaded by the Louisiana Supreme Court's denial of a writ of certiorari, for the given reason that "on the facts found by the Court of Appeal, the result is correct." *Charouleau v. Charity Hospital at New Orleans, et al.,* 323 So.2d at 137.

■ Since the question properly is one of competency of witnesses, plaintiff's first contention that the jury should determine what weight, if any, should be given to nonresident physicians' testimony is erroneous. Competency of witnesses is a question for the Court under both federal and Louisiana law. *Miley v. Delta Marine Drilling Company,* 473 F.2d 856 (5 Cir.), rehearing den. 472 F.2d 1405, cert. den. 414 U.S. 871, 94 S.Ct. 93, 38 L.Ed.2d 89 (1973); *United*

*States v. 71.29 Acres of Land,* 376 F.Supp. 1221 (W.D.La., 1974); *Ashley v. Nissan Motor Corporation in U. S. A.,* 321 So.2d 868 (La.App. 1st Cir., 1975), writ den. 323 So.2d 478 (La., 1975).

Plaintiff's urging of the rule of *Favalora v. Aetna Casualty & Surety Co., supra,* is inapposite here. Mrs. Favalora sustained personal injuries when she fainted while standing unsupported during an x-ray examination. Evidence showed that neither the radiologist nor any of his subordinates had sought medical history from plaintiff prior to the x-ray exam. Had anyone done so, he would have learned that the purpose of Mrs. Favalora's hospitalization was to determine the cause of frequent fainting spells. There was testimony that defendant's procedures were in accord with local community standards; however, there was irrefutable evidence given by a local physician that the local community standard was not in conformity with procedures taught in medical schools and other medical instructional institutions. Thus, the Court held:

> "We believe that conformity with the standard of care observed by other medical authorities in good standing in the same community cannot be availed of as a defense in a malpractice action when the criterion relied upon is shown to constitute negligence in that it fails to guard against injury to the patient from a reasonably foreseeable contingency. . .
>
> "To relieve a member of the medical profession from liability for injury to a patient on the ground that he followed a degree or standard of care practiced by others in the same locality is, in our opinion, unthinkable when the degree or standard of care in question is shown to constitute negligence because it fails to meet the test of the medical profession." *Favalora v. Aetna Casualty & Surety Co., supra,* 144 So.2d at 550, 551.

■ We have no quarrel with the soundness of this rule. However, opinion testimony offered to prove that conformity with local standards is unreasonable "in that it fails to guard against injury to the patient

from a reasonably foreseeable contingency," *Favalora, supra,* 144 So.2d at 550, and to what extent conformity with local standards is unreasonable, should be elicited from a witness who is intimately familiar with standards of medical practice in the community. A physician without such familiarity simply is incompetent to appear and give opinion testimony on the reasonableness of those standards. *Charoleau, supra.*

Finally, plaintiff's third contention, that defendants' testimony on cross examination should be compared to other testimony (that is, nonresident experts) as to the standard which should be applied in communities of *similar size and location,* plainly is without merit. Louisiana simply does not recognize the similar locality rule; rather the standard of care to be exercised by physicians is that exercised by others in the *same locality.*

■ Accordingly, for the foregoing reasons, defendants' motion to exclude the opinion testimony of physicians not licensed to practice medicine in Louisiana hereby is granted.

However, a statement of Mr. Justice Frankfurter applies well here: "It is not to be denied that argumentative skill, as was shown at the bar, could persuasively and not unreasonably reach either of the conflicting constructions." *Bell v. United States,* 349 U.S. 81, at 83, 75 S.Ct. 620, at 622, 99 L.Ed. 905. Moreover, we believe the issue of nonresident physicians' testimony presents a "controlling question of law as to which there is substantial ground for difference." 28 U.S.C. § 1292(b). We note that three of Louisiana's seven Supreme Court Justices dissented from the writ denial in *Charouleau, supra.*

Accordingly, upon presentment of a motion and order by plaintiff's counsel, we will certify the question for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Under Rule XII of the Supreme Court of Louisiana, if it grants the interlocutory appeal (and, for reasons of judicial economy, we strongly urge that it do so), the Circuit Court of Appeals for the Fifth Circuit then

may certify the question to the Louisiana Supreme Court.[10]

## ADDENDUM

Because we were so engrossed in the legal aspects of this opinion, we neglected to point out that the two New York Doctors, whose testimony we ruled should be excluded from evidence, are *the only medical witnesses* whom plaintiff has been able to obtain to testify in his behalf regarding liability *vel non* on the part of the insurers of Doctors Long and Faludi. *Davis v. Duplantis,* 448 F.2d 918 (5th Cir., 1971).

Consequently, should our ruling ultimately be upheld on appeal, at the close of plaintiff's evidence, upon motion, we would be required to grant a directed verdict in favor of those defendants.

Thus, our ruling constituted a controlling question of law which would be dispositive of plaintiff's case against those defendants.

---

**10.** That Rule reads:

"Section 1. When it appears to the Supreme Court of the United States, or to any circuit court of appeal of the United States, that there are involved in any proceedings before it questions or propositions of law of this state which are determinative of said cause independently of any other questions involved in said case and that there are no clear controlling precedents in the decisions of the supreme court of this state, such federal court before rendering a decision may certify such questions or propositions of law of this state to the Supreme Court of Louisiana for rendition of a judgment or opinion concerning such questions or propositions of Louisiana law. This court may, in its discretion, decline to answer the questions certified to it."