360 So.2d 1331 (1978)
Dorothy Hebert ARDOIN et al.
v.
HARTFORD ACCIDENT AND INDEMNITY CO. et al.
Nos. 60992, 61008 and 61011.
Supreme Court of Louisiana.
June 19, 1978.
Rehearing Denied July 26, 1978.
Welton P. Mouton, Jr., Law Office of Welton P. Mouton and Richard R. Kennedy, Law Office of Richard R. Kennedy, Lafayette, *1332 for defendants-respondents in three cases.
Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Timothy J. McNamara, Daniel G. Fournerat, Lafayette, for plaintiffs-applicants in 60992 and for respondents in 61008 and 61011.
H. Lee Leonard, Voorhies & Labbe, Lafayette, for defendants-respondents in all three cases.
Lynn C. Woods, Jr., Houston, Tex., for plaintiff-applicant in 61011 and for respondent in 60992 and 61008.
James T. Guglielmo, Lewis & Lewis, Opelousas, for applicant in No. 61008 and for respondents in 60922 and 61011.
Stephen J. Ledet, Jr., Opelousas, amicus curiae for St. Landry Parish Medical Society.
Thompson & Sellers, Charles M. Thompson, Jr., Abbeville, amicus curiae for Vermilion Parish Medical Society.
J. William Pucheu, Fuselier, Pucheu & Soileau, Ville Platte, amicus curiae for Evangeline Parish Medical Society.
Paul H. Due and Robert D. Downing, Due, Dodson & deGravelles, Baton Rouge, amicus curiae for The La. Trial Lawyers Association.
Richard R. Kennedy, Lafayette, amicus curiae for Lafayette Parish Medical Society.
John V. Parker, Sanders, Downing, Kean & Cazedessus, Baton Rouge, amicus curiae for La. State Medical Society.
DENNIS, Justice.
In this case we are called upon to decide if Louisiana courts are governed by the "locality rule" in determining whether an act of a medical specialist that causes damage to his patient constitutes fault which obliges the physician to repair it.
On July 9, 1976, Lorrie Ardoin died during a "coronary artery by-pass" operation which was being performed by Dr. James Bozeman, a cardiovascular surgeon, at Our Lady of Lourdes Hospital in Lafayette, Louisiana. This type of operation requires that the patient's heart be stopped and that his vital functions be maintained by a "heart-lung" machine throughout the surgery. The apparatus consists of a pump with tubes which are used to suction blood from the patient's body and return it to his arteries after the blood has been oxygenated. This process is known as cardiopulmonary perfusion and the hospital attendants who operate the heart-lung machine are called perfusionists. Coincidentally with Ardoin's operation the hospital initiated the use of new tubing manufactured by Bentley Laboratories, Inc. in its cardiopulmonary perfusion. Because the hospital previously used another medical supplier's tubing, Bentley Laboratories' district manager, Travis Bohannon, was present during the operation for the purpose of assisting Darrell Gregory and Ronald DeBlanc, the hospital perfusionists, in attaching the new tubing to the heart-lung machine. After the cardiopulmonary apparatus had been assembled and the surgery was underway, Dr. Bozeman attached one of the tubes to the ventricle of the patient's heart for the purpose of pumping blood from the patient into the oxygenator. Instead of suctioning blood as it should have, however, the tube pumped air into Ardoin's heart. Death followed instantaneously when a massive air embolism reached the patient's brain.
The decedent's wife and nine children brought a wrongful death action alleging various acts of negligence on the part of the following defendants: Dr. James Bozeman, the cardiovascular surgeon; Darrell E. Gregory, perfusionist; Ronald DeBlanc, perfusionist; Our Lady of Lourdes Hospital; Travis Bohannon, district manager for Bentley Laboratories, Inc.; and Bentley Laboratories, Inc. Numerous third party demands were filed by the defendants and their insurers. Our review is limited to the third party action filed by Travis Bohannon, Bentley Laboratories, Inc. and its insurers against Dr. Bozeman.
At the time of the operation there were four physicians in Lafayette holding themselves out as specialists in cardiovascular surgery, viz., Dr. Bozeman, Dr. Leslie Guidry, Bozeman's expert witness, and Dr. Guidry's *1333 two partners. During a trial by jury Dr. Bozeman testified that in Lafayette the customary practice during a by-pass operation did not require a cardiovascular surgeon to test a perfusion tube to determine if it was properly working before inserting it into a patient's heart. Dr. Bozeman admitted that the direction of air flow in such a tube can be tested easily by dipping it in a sterile solution or in the blood draining into the patient's chest cavity. However, the surgeon stated that he did not perform this test but only looked at the line to see if it was the correct one. Dr. Bozeman testified that he depended on the perfusionists to check the heart-lung machinery for proper directional flow of air in the lines because his attention must be directed to other matters of importance during the operation. Testimony given by Dr. Guidry as to the customary practice in Lafayette was in accordance with that of Dr. Bozeman.
In an effort to prove negligence on the part of Dr. Bozeman in not testing the tube before inserting it into Ardoin's heart the third party plaintiffs sought to introduce the testimony of Dr. Prentiss Smith, a cardiovascular surgeon. Because Dr. Smith practiced in Baton Rouge and was not familiar with the care or skill of cardiovascular surgeons in Lafayette the trial judge ruled that Dr. Smith was not a competent witness. A proffer by statement was made which indicated that Dr. Smith would have testified that the degree of skill possessed and care ordinarily exercised by physicians within his specialty in the performance of a coronary artery by-pass operation requires a surgeon to test a perfusion tube by dipping it in either blood or a sterile solution before inserting it into a patient's heart.
Upon conclusion of the trial, the jury found negligence on the part of Gregory, one of the perfusionists, and Bohannon, the district manager of Bentley Laboratories. No negligence was found by the jury on the part of Dr. Bozeman. The demands of the plaintiffs and third parties against Dr. Bozeman were dismissed and judgments totalling $405,000 were rendered in behalf of the plaintiffs against Gregory, Bohannon and their employers and insurers. Appeals were perfected by defendants Gregory and Bohannon, their employers and their insurers. Plaintiffs answered the appeals asking for an increase in the amount of damages awarded.
On appeal the court of appeal refused to vacate or modify the awards made to the plaintiffs and affirmed the dismissal of the third party demands against Dr. Bozeman. Ardoin v. Hartford Accident & Indemnity Company, 350 So.2d 205 (La.App.3d Cir. 1977). In rejecting the third party plaintiffs' assertions that the trial court erred in precluding the testimony of Dr. Prentiss Smith, the Baton Rouge specialist, the intermediate court relied primarily on this Court's opinion in Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1953). In that case this Court stated that a physician, surgeon or dentist has a duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment in the application of his skill to the case. Since Dr. Smith was not qualified to testify as to the degree of skill ordinarily employed by specialists performing cardiovascular surgery in Lafayette, the court of appeal concluded that his testimony was correctly excluded. Secondarily, the intermediate court held that no modifications in the law favorable to medical patients had been effected by La.R.S. 9:2794 and that the trial court's ruling was therefore consistent with this statute.
We granted writs on behalf of third party plaintiff Bohannon, his employer and their insurers, to review the questions of law raised by the exclusion of Dr. Smith's testimony, viz., whether the interpretation of the law as to a physician's duty to his patient was correctly set forth in Meyer v. St. Paul-Mercury Indemnity Co.; whether the law in this regard was altered by La. R.S. 9:2794; and, if so, whether the legislation applies to quasi-offenses occurring before its effective date.
*1334 The standard of conduct required of persons in Louisiana in their relationships with one another is stated in simple, general terms set forth in Article 2315 of the Louisiana Civil Code of 1870:
"Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it.
"* * *."
This single article forms the basis of all tort liability in Louisiana.[1] The remaining articles of the Civil Code's chapter of legal principles regulating offenses and quasi-offenses, Articles 2316 through 2324, contain amplifications as to what constitutes "fault" and under what circumstances a defendant may be held liable for his act or that of a person or thing for which he is responsible.[2]
Under the civilian tradition of our state the courts have been given a broad, general principle of legislative will from which they are required to determine when the interest of society is best served by requiring one who harms another to respond in damages for the injury caused.[3] In deciding whether the conduct in a specific case falls below that in which a person can engage without becoming responsible for resultant damage, a court must refer first to the fountainhead of responsibility, Article 2315, and next in applying the article to the many other articles in our code which deal with the responsibility of certain persons or that which arises due to certain types of activity.[4] After searching through the code itself a jurist should refer in turn to the acts of the legislature, local governments, and other legislative and administrative bodies. Then, having explored the legislative and administrative sources of standards of proper conduct, a court should turn next to the experience of the judiciary in the interpretation and application of these standards to actual situations.[5]
In deciding the issue before us the lower courts did not follow the process of referring first to the code and other legislative sources but treated language from a judicial opinion as the primary source of law. This is an indication that the position of the decided case as an illustration of past experience and the theory of the individualization of decision have not been properly understood by our jurists in many instances. Therefore, it is important that we plainly state that, particularly in the changing field of delictual responsibility, the notion of stare decisis, derived as it is from the common law, should not be thought controlling in this state.[6] The case law is invaluable as previous interpretation of the broad standard of Article 2315, but it is nevertheless secondary information.[7]
Starting first with the keystone for tort responsibility in Louisiana, Article 2315, we notice that it places no geographical or occupational *1335 limitations on the notion of "fault." Likewise, Article 2316 speaks very broadly of every person's responsibility for the damage he shall occasion "not merely by his act, but by his negligence, his imprudence, or his want of skill." Under these articles a medical specialist who injures a patient through his negligence, imprudence or want of skill must respond in damages. The code does not in any of its articles condition recovery by an injured patient upon proof of the physician's fault in relation to the medical standard of care or skill within a particular community or locality. Accordingly, the code itself does not provide for special or localized definitions of negligence, imprudence or want of skill by doctors.
By Act 807 of 1975, which became La.R.S. 9:2794, however, the legislature enacted legislation apparently intended to have an effect of this sort upon the proof of fault by physicians and dentists not engaged in a specialized practice.[8] The statute expressly states that a patient who has been damaged by the act or omission of a physician or dentist must prove the degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists practicing in the same community or locality in which the defendant practices. The statute further requires that in order to recover a patient must also prove that he suffered injuries proximately caused by the defendant's lack of knowledge or skill or the failure to use reasonable care and diligence, along with his best judgment.
In contrast with the standard of conduct and burden of proof affecting practitioners not engaged in a specialty, the statute further provides that where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff "has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty."[9] Thus, the legislature has provided guidance in applying the Civil Code's general principle of fault to the acts of a particular medical specialist by directing that they be measured by the degree of care ordinarily practiced by others involved in the same specialty. Unlike the statute's standard of care for practitioners not engaged in a specialty, the specialist's duty is not governed by the professional standard within a particular locality or community.
The court of appeal read the statute differently and concluded that it impliedly provides localized definitions of negligence, imprudence and want of skill by medical specialists. This erroneous interpretation resulted from a misapprehension of the civilian nature of our delictual responsibility laws as well as a disregard of the rules for their interpretation set forth in Articles 13-20 of the Civil Code.
Instead of beginning with the keystone of responsibility, Article 2315, and reading La. R.S. 9:2794 in the light of it and other pertinent articles, the intermediate court approached the problem as one of deciding the extent, if any, to which the jurisprudence had been amended by the legislative act. Thus, rather than reading La.R.S.
*1336 9:2794 as the lawmakers' indication of how the basic principle of Article 2315, as amplified by Article 2316, should be applied in a particular class of cases, the appeals court measured the enactment solely against language contained in a judicial opinion. The basic error in this method of interpretation is that it not only ignores the first principles of our law but it also assumes that jurisprudence is equivalent to legislation instead of treating it as judicial interpretation which may or may not adequately reflect the meaning of the laws for contemporary purposes.[10]
On the other hand, adherence to civilian theory requires a jurist to begin with the broad principle of Article 2315 that everyone must repair the damage caused by his fault, and with the amplification of Article 2316 that fault includes everyone's negligence, imprudence or want of skill as measured against a general standard of conduct. Due notice next should be taken of our constitution's virtual prohibition of local legislation [11] and the lack of any geographical differentiation between physicians licensed in Louisiana under the medical practice act.[12] A comparison should be made of the laws prescribing uniform standards of competence or conduct for other professions or classes of occupations.[13] At this point a tenet of our legal philosophy becomes apparent, i. e., that civil and criminal sanctions imposed for socially unacceptable conduct should be applied equally throughout the state to all citizens within the same class or set of circumstances. Therefore, one must conclude that, if the legislature were to act contrary to this policy by establishing a different definition of negligence, imprudence or want of skill by a medical specialist within each locality, the lawmaking body would express its intention explicitly. Since La.R.S. 9:2794 contains no such expression pertaining to medical specialists, the statute should not be given the effect of Balkanizing those representing themselves as having superior skill or knowledge beyond that common to the medical profession by the application of varying geographic standards of fault.
Furthermore, an application of the Civil Code rules of statutory construction leads to the same conclusion. As the court of appeal opinion plainly reflects, words must be added by the court to the portion of the statute pertaining to medical specialists in order to tie the standard of conduct prescribed therein to the locality rule.[14] Such an interpretation tends to disregard the expression of the legislative will. Courts must give to the words used by the legislature the meaning they are ordinarily understood to have, and when the law is clear and free from any ambiguity, the letter of it must not be disregarded under the pretext of pursuing its spirit. La.C.C. arts. 13, 14.
Since the meaning of the law is not dubious, it is unnecessary to consider the reason and spirit of it, cf. La.C.C. art. 18, but a survey of the possible considerations underlying its enactment confirms our interpretation.
By refusing to adopt a standard tied to locality for specialists, the legislature simply may have chosen to recognize the realities *1337 of medical life. The various medical specialties have established uniform requirements for certification. The national boards dictate the length of residency training, subjects to be covered, and the examinations given to the candidates for certification. Thus the medical profession itself recognizes national standards for specialists that are not determined by geography.[15] Indeed, whatever may have justified a locality rule for physicians fifty or a hundred years ago cannot be reconciled with the actualities of medical practice today.[16] The quality of medical school training has improved dramatically. With modern transportation and communication systems, new techniques and discoveries are available to all doctors within a short period of time through seminars, medical journals, closed circuit television presentations, special radio networks for doctors, tape recorded digests of medical literature, and current correspondence courses.[17]
It is generally recognized that a rule of law which restricts proof of medical negligence to a standard of care within a locality tends to promote three evils: (1) It may effectively immunize from liability any doctor who happens to be the sole practitioner in his community. "He could be treating bone fractures by the application of wet grape leaves and yet remain beyond the criticism of more enlightened practitioners from other communities;" [18] (2) The practitioners in a community are able to establish the standard of care which could, perhaps, be an inferior one; (3) A "conspiracy of silence" in the plaintiff's locality could effectively preclude any possibility of obtaining expert medical testimony.[19] Because fewer specialists than generalists are likely to be found in most communities, the potential for these detrimental effects would only be exacerbated by extending the locality rule to specialists.
In recognition of the locality rule's possible harsh consequences and the fact that the practice of medicine by certified specialists within most medical specialties is similar throughout the country,[20] many jurisdictions have abandoned entirely the locality rules as to specialists. Bruni v. Tatsumi, 46 Ohio St.2d 127, 346 N.E.2d 673 (1976); Shilkret v. Annapolis Emergency Hospital Association, 276 Md. 187, 349 A.2d 245 (1975); Shier v. Freedman, 58 Wis.2d 269, 206 N.W.2d 166 (1973); Naccarato v. Grob, 384 Mich. 248, 180 N.W.2d 788 (1970); Wiggins v. Piver, 276 N.C. 134, 171 S.E.2d 393 (1970); Kronke v. Danielson, 108 Ariz. 400, 499 P.2d 156 (1972); Brune v. Belinkoff, 354 Mass. *1338 102, 235 N.E.2d 793 (1968). This is consistent with the position advocated by the American Law Institute. Restatement of Torts (Second) § 299A (1965) (comment d).
Moreover, only a distinct minority of states still adhere to the strict locality rule. Dunham v. Elder, 18 Md.App. 360, 306 A.2d 568 (1973); Gandara v. Wilson, 85 N.M. 161, 509 P.2d 1356 (1973); Levett v. Etkund, 158 Conn. 567, 265 A.2d 70 (1969); Lockart v. Maclean, 77 Nev. 210, 361 P.2d 670 (1961). A plurality of states now apply the "similar locality" rule, see, e. g., Mecham v. McLeay, 193 Neb. 457, 227 N.W.2d 829 (1975); Karrigan v. Nazareth Convent & Academy, Inc., 212 Kan. 44, 510 P.2d 190 (1973); Runyon v. Reid, 510 P.2d 943 (Okl.1973); Burton v. Smith, 34 Mich.App. 270, 191 N.W.2d 77 (1971); Incollingo v. Ewing, 444 Pa. 263, 299, 282 A.2d 206 (1977); whereas some courts have extended geographic boundaries to include those centers readily accessible for appropriate treatment. See, Gist v. French, 136 Cal.App.2d 247, 288 P.2d 1003 (1955); Josselyn v. Dearborn, 148 Me. 328, 62 A.2d 174 (1948); Tvedt v. Haugen, 70 N.D. 338, 294 N.W. 183 (1940); cf. Pederson v. Dumouchel, 72 Wash.2d 73, 431 P.2d 973 (1967).
Although as noted by the court of appeal, La.R.S. 9:2794 was enacted as part of a legislative campaign[21] to provide the medical profession with additional protection from occupational litigation, there is no justification for assuming that every sentence in this body of laws must be construed against its obvious meaning and in favor of the interest group which it generally benefits. Casual observation tells us that all legislation is founded on the principle of mutual concession. To interpret a statute in a totally one-sided manner simply because it was introduced and passed at the behest of one class of citizens may in effect read out of the law compromises which were crucial to its enactment. There is no logical reason why the legislature could not have intended to afford various protections to the medical profession and at the same time reject the idea of localized standards of conduct as to specialists. It is evident, in fact, that a locality rule for specialists would not be rooted in reality.
If La.R.S. 9:2794 does not adopt a standard tied to locality for specialists, counsel for respondent Dr. Bozeman alternatively contends that the statute can have no application to the instant case. Although the statute was in effect before the trial, he argues that because it was enacted subsequent to Ardoin's death it cannot be applied retrospectively to the wrongful death action resulting therefrom.
The general principle of non-retroactivity of laws is stated in Article 8 of the Civil Code, which provides:
"A law can prescribe only for the future; it can have no retrospective operation, nor can it impair the obligation of contracts."
According to civilian theory, however, the principle of non-retroactivity of existing legislation admits three exceptions: laws that suppress or lessen penalties, laws that are merely interpretive of existing legislation, and those that the legislature has expressly or impliedly declared to be retroactive. 1 M. Planiol, Civil Law Treatise, Nos. 249-252 (La.St.L.Inst.Transl.1959); A. Yiannopoulos, Civil Law System, 68 (1977).
The exception relating to interpretive laws has been explained by Professor Yiannopoulos as follows:
"* * * The exception . . . is justified on the ground that these laws do not establish new rules; they merely determine the meaning of existing laws and may thus be applied to facts occurring prior to their promulgation. In these circumstances, there is an apparent rather than real retroactivity, because it is the original rather than the interpretive law that establishes rights and duties. * *" Yiannopoulos, supra, at p. 68.
This Court has recognized that interpretive legislation cannot properly be said to *1339 divest vested rights, because, under civilian theory, such legislation does not violate the principle of non-retroactivity of laws. The interpretive legislation does not create new rules, but merely establishes the meaning that the interpreted statute had from the time of its enactment. It is the original statute, not the interpretive one, that establishes rights and duties. Gulf Oil Corporation v. State Mineral Board et al., 317 So.2d 576 (La.1974); 1 M. Planiol, Treatise on the Civil Law, § 251 at 179 (La.State L.Inst. Transl.1959); cf. Green v. Liberty Mutual, 352 So.2d 366 (La.App. 4th Cir. 1977).
According to this Court's consistent interpretation, Article 8 of the Civil Code contemplates substantive laws as distinguished from merely procedural or remedial laws which will be given retroactive effect in the absence of language showing a contrary intention. General Motors Acceptance Corporation v. Anzelmo, 222 La. 1019, 1028, 64 So.2d 417, 420 (1953); Stallings v. Stallings, 177 La. 488, 148 So. 687 (1933); State v. Brossette, 163 La. 1035, 113 So. 366 (1927).
Applying these principles to La.R.S. 9:2794, we conclude that the statute should be given retrospective effect. To the extent that the statute establishes a burden of proof in malpractice actions, it clearly should be characterized as procedural and therefore applied to pre-existing facts and relations. Insofar as the statute describes a standard of conduct, it merely determines more precisely the meaning of certain kinds of fault by certain classes of defendants, i. e., professional negligence, imprudence and want of skill by medical generalists and specialists, who were originally responsible for the damage occasioned by such fault under Articles 2315 and 2316. Accordingly, La.R.S. 9:2794 is an interpretive statute which does not establish new rights and duties but merely determines the meaning of existing laws and may thus be applied to facts occurring prior to its promulgation.
Having consulted the pertinent legislative sources for standards of proper conduct, we turn next to the experience of the judiciary in search of assistance in the interpretation and application of these standards to the actual situation at hand. Unfortunately, there does not appear to be any previous case in which a court has actually utilized either the civil code or La.R.S. 9:2794 in determining a physician's standard of conduct.[22] Before the enactment of La.R.S. 9:2794 this Court had several opportunities to refer to Articles 2315 and 2316 in suits based on medical negligence, imprudence or want of skill, but in each case it either failed to disclose the legal basis of its decision or chose to rely on the jurisprudence of other states. Consequently, there does not appear to be any authoritative judicial interpretation of Louisiana statutory law pertinent to a physician's duty toward his patient. Moreover, the extant court opinions based on foreign authorities are inconsistent in the articulation of a standard of medical care and in the application of the varying standards to the facts of each case.
In one of the earliest cases on the subject, this Court, without citing any authority, declared in its syllabus that an oculist "must exercise . . . the care and skill usually exercised by oculists in good standing. . . [and] may be rendered liable for his gross mistakes."[23] No mention of geographical limits appeared in the jurisprudence until Roark v. Peters[24] in which a common law cyclopedia was relied upon to announce that physicians would be held to the standard of skill and learning in "similar localities." Twenty-eight years later this Court again relied on common law authorities in narrowing the similar locality rule to a "strict" or "same locality" rule in Meyer v. St. Paul-Mercury Indemnity Co.[25] *1340 Although the rule was proclaimed once more in 1966 by the opinion of Uter v. Bone and Joint Clinic,[26] the Court ignored it in discussing with seeming approval the testimony of a New Orleans specialist in the trial of the defendant Baton Rouge doctor. In view of the lack of coherence in this Court's decisions it is not surprising that the courts of appeal have also been inconsistent.[27]
From our review of these cases, we conclude that in this field this Court and the intermediate courts have failed to base their decisions on applicable civil code articles and statutes. Instead, the courts uncritically adopted from common law cyclopedias malpractice rules which no longer represent either the prevailing or the emerging view in the nation. The past decisions by Louisiana appellate courts demonstrate the danger of forsaking the first principles of our own law for the momentary consensus of the law in other states. Insofar as Meyer v. St. Paul-Mercury Indemnity Co. and our jurisprudence are in conflict with the views expressed in this opinion, they are expressly overruled.

Conclusion
For the foregoing reasons, we hold that a medical specialist is required by La. Civil Code Articles 2315 and 2316, and La. R.S. 9:2794, to exercise the degree of care and possess the degree of knowledge or skill ordinarily exercised and possessed by physicians within his medical specialty; that the plaintiff seeking to prove that a medical specialist failed to adhere to these standards of care or skill is not limited to expert medical testimony by witnesses practicing or familiar with the standards of care and skill within the defendant specialist's community or locality; and that, accordingly, the lower courts fell into error in the instant case by ruling that testimony pertaining to the standard of care or skill within the involved medical specialty could not be presented because of a locality rule.
Accordingly, testimony of qualified experts, regardless of whether practicing within or familiar with the defendant doctor's locality is admissible to prove the degree of care ordinarily exercised and the degree of skill or knowledge ordinarily possessed by physicians within the involved medical specialty. However, evidence of the local facilities and resources available, as well as evidence of other pertinent local conditions, is also admissible and should be considered by the trier of fact in determining whether a physician exhibiting the care, knowledge and skill ordinarily exhibited by physicians within the involved medical speciality would have acted or failed to act in the manner of the defendant doctor at the time in question.
The judgment of the court of appeal is reversed and the third party demand of Bohannon, his employer and their insurers against Dr. Bozeman is remanded to the trial court for a new trial in accordance *1341 with the views expressed herein. Costs in this Court are assessed to the third party defendants.
SANDERS, C. J., concurs.
SUMMERS, J., dissents.
MARCUS, J., concurs and assigns reasons.
MARCUS, Justice (concurring).
La.R.S. 9:2794 provides in pertinent part:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., or a dentist licensed under R.S. 37:751 et seq., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists practicing in the same community or locality to that in which the defendant practices; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty.
The issues presented for determination in the instant case are whether the above statute should be given retrospective effect and, if so, whether the legislature intended by this statute to extend the "same community or locality" rule applied generally to physicians or dentists in the first part of subsection A(1) to medical specialists referred to in the second part.
First, I agree that the statute should be given retrospective effect for the reasons assigned in the majority opinion. Secondly, the statute provides that, where a defendant (physician or dentist) practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the "burden of proving" the degree of care ordinarily practiced by physicians or dentists "within the involved medical specialty." In my view, the statute makes it clear that the "same community or locality" rule which applies generally to physicians or dentists in the first part of the subsection does not apply to medical specialists in the second part; rather, medical specialists are required to exercise the degree of care and possess the degree of knowledge or skill ordinarily exercised by physicians "within the involved medical specialty." Hence, the courts below erred by ruling that testimony pertaining to the standard of care or skill within the involved medical specialty could not be presented because of the locality rule. Accordingly, I respectfully concur.
NOTES
[1] Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133 (1971); Stone, Tort Doctrine in Louisiana, 17 Tul.L.Rev. 159, 163 (1941).
[2] Loescher v. Parr, 324 So.2d 441 (La.1976).
[3] Langlois v. Allied Chemical Corp., supra, 249 So.2d at 137.
[4] Langlois v. Allied Chemical Corp., supra, 249 So.2d at 137; see, Loescher v. Parr, 324 So.2d 441 (La.1976); Turner v. Bucher, 308 So.2d 270 (La.1975); Holland v. Buckley, 305 So.2d 113 (La.1974); Stone, Tort Doctrine in Louisiana, 17 Tul.L.Rev. 159, 212.
[5] Langlois v. Allied Chemical Corp., supra, 249 So.2d at 137; Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821 (1971); Stone, Tort Doctrine in Louisiana, 17 Tul.L.Rev. 159, 213 (1942).
[6] See, Stone, Tort Doctrine in Louisiana, 17 Tul.L.Rev. 159, 214 (1942); Morrow, Louisiana Blue Print: Civilian Codification and Legal Method for State and Nation, 17 Tul.L.Rev. 351 (1943); Daggett, Dainow, Hebert & McMahon, A Reappraisal Appraised: A Brief for the Civil Law of Louisiana, 12 Tul.L.Rev. 12, 20 (1937); Cf. Holland v. Buckley, 305 So.2d 113, 119 (La.1974); Miami Corporation v. State, 186 La. 784, 173 So. 315 (1936).
[7] As Professor Stone observed:

"There is much wisdom in the reports, much useful analogy, much experience, but even so, we must remember that neither wisdom nor experience is the monopoly of any one age or of any one set of judges. The search for truth and justice must be a continual search, a building from the truth and error of the past to the solution of the present and the hope for the future." 17 Tul.L.Rev. 159, 214.
[8] La.R.S. 9:2794 provides, in pertinent part:

"(A) In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., or a dentist licensed under R.S. 37:751 et seq., the plaintiff shall have the burden of proving:
"(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists practicing in the same community or locality to that in which the defendant practices; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty.
"(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
"(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred. "* * *."
[9] La.R.S. 9:2794.
[10] See, Holland v. Buckley, 305 So.2d 113, 119 (La.1974).
[11] See, La.Const.1974, Art. 3, § 12, prohibiting local or special laws concerning civil actions including "changing the rules of evidence in any judicial proceeding or inquiry before courts * * *."
[12] La.R.S. 37:1261 et seq.
[13] See, e. g., The Code of Professional Responsibility in the Articles of Incorporation of the Louisiana State Bar Association (attorneys); La.R.S. 37:141 et seq. (architects); La.R.S. 37:911 et seq. (nurses); La.R.S. 37:1171 et seq. (pharmacists); La.R.S. 37:1431 et seq. (real estate brokers).
[14] The court of appeal interpreted the statute in the following manner:

"* * * The initial phrase in sub-section A(1) modifies the second phrase in that subsection to the end that plaintiff's burden in a malpractice suit involving alleged acts of medical negligence peculiar to a particular medical specialty is to prove the degree of care ordinarily practiced by physicians within the involved medical specialty `in the same community or locality to that in which the defendant practices.' " 350 So.2d 205, 219.
[15] Shilkret v. Annapolis Emergency Hospital Association, 276 Md. 187, 349 A.2d 245 (1975); Comment, Medical Specialties and the Locality Rule, 14 Stan.L.Rev. 884 (1962).
[16] The rationale for the geographically limited standard of care developed by the courts many years ago was to protect doctors practicing in rural areas who were unable to keep current with developments emerging in the urban centers because of slow modes of transportation and communication. The rural practitioner was not expected to meet the same standard of care as the city doctor who had access to a metropolitan hospital and its facilities for both treatment and learning. See, discussion in Brune v. Belinkoff, 354 Mass. 102, 235 N.E.2d 793 (1968) and authorities cited in footnote 17, infra.
[17] J. Waltz, The Rise and Gradual Fall of the Locality Rule in Medical Malpractice Litigation, 18 DePaul L.Rev. 408 (1969); Comment, A Review of the Locality Rule, 1975 Univ. of Ill.L. Forum 96; Comment, Standard of Care for Medical Specialists, 16 St. Louis Univ.L.J. 497 (1972); Comment, An Evaluation of Changes in the Medical Standards of Care, 23 Vand.L.Rev. 729 (1970); Comment, Standard of Care for Medical PractitionersThe Locality Rule, 14 S.Dak.L.Rev. 349 (1969); Comment, The Locality Rule in Medical Malpractice Suits 5 Cal.W. L.Rev. 124 (1968); Comment, Recent DevelopmentsMedical Specialties and the Locality Rule, 14 Stan.L.Rev. 884 (1962); Note, 38 Ohio St.L.J. 202 (1977); Note, 25 Ark.L.Rev. 169 (1971); Note, 18 DePaul L.Rev. 328 (1968). Bruni v. Tatsumi, 46 Ohio St.2d 127, 346 N.E.2d 673 (1976); Shilkret v. Annapolis Emergency Hospital Association, 276 Md. 187, 349 A.2d 245 (1975).
[18] J. Waltz, The Rise and Gradual Fall of the Locality Rule in Medical Malpractice Litigation, 18 DePaul L.Rev. 408, 411 (1969).
[19] See authorities cited in Footnote 17 supra.
[20] Comment, Medical Specialties and the Locality Rule, 14 Stan.L.Rev. 884, 887-89 (1962).
[21] See, La.R.S. 9:2793, 2794; La.R.S. 40:1299.41 et seq.; Everett v. Goldman, 359 So.2d 1256 (La.1978).
[22] See, Percle v. St. Paul Fire and Marine Ins. Co., 349 So.2d 1289 (La.App. 1st Cir. 1977), in which the court of appeal mistakenly assumed La.R.S. 9:2794 could not be applied retrospectively.
[23] Stern v. Lanng, 106 La. 738, 31 So. 303 (1901).
[24] 162 La. 111, 110 So. 106 (1926).
[25] 225 La. 618, 73 So.2d 781 (1954). Although the opinion cites Louisiana appellate decisions, along with Corpus Juris Secundum, the cases do not support the rule as announced.
[26] 249 La. 851, 192 So.2d 100 (1966).
[27] Although the courts of appeal often cite Meyer as establishing the standard of care owed by physicians, its language has not been followed consistently in determining the competency of an expert witness to testify on the issue of negligence. Some intermediate courts have held that an expert witness who does not practice in the defendant's community and who is not familiar with the standard of care practiced in that community is incompetent to testify. See, Caldwell v. Parker, 340 So.2d 695 (La.App. 4th Cir. 1976); cf. Charoleau v. Charity Hospital, 319 So.2d 464 (La.App. 4th Cir. 1975); Samuels v. Doctors Hospital, Inc., 414 F.Supp. 1124 (W.D.La.1976). Others, however, have considered the testimony of "non-local" experts. Chapman v. Argonaut-Southwest Ins. Co., 290 So.2d 779 (La.App. 1st Cir. 1974); Zachary v. St. Paul Fire and Marine Ins. Co., 249 So.2d 273 (La.App. 1st Cir. 1971). Another departure from the Meyer strict locality rule is found in the approach taken by the appellate court in Favalora v. Aetna Casualty and Surety Co., 144 So.2d 544 (La.App. 1st Cir. 1962). In that case the court held that a doctor's compliance with the community standard of care would not shelter him from liability if the procedure followed by the doctor is recognized by members of the same profession not only as being faulty but also contrary to what members of the profession have been taught in medical institutions of learning.