## TRANSCONTINENTAL GAS PIPE LINE CORPORATION

v.

## LLOYDS, LONDON, et al.

### Civ. A. No. 89–398–A.

United States District Court, M.D. Louisiana.

March 7, 1990.

---

Gary A. Bezet, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, La., for plaintiff.

James H. Roussel, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendants.

James M. Tompkins, Galloway, Johnson, Tompkins & Burr, New Orleans, La., for intervenor Transportation Ins. Co.

### RULING ON MOTIONS FOR SUMMARY JUDGMENT

JOHN V. PARKER, Chief Judge.

This matter is before the court on motions for summary judgment filed by defendants and by intervenor, Transportation Insurance Company. Plaintiff opposes both motions. This matter was submitted following oral argument. Jurisdiction is allegedly based upon diversity of citizenship.

Transcontinental Gas Pipe Line Corporation brings this action against several defendants, the "Underwriters at Lloyd's," who issued a comprehensive general liability insurance policy to Associated Painting Services. Plaintiff claims that the policy obligated defendants to defend and indemnify it against an action brought by Larry Dunn, an employee of Associated Painting Services.

It appears that the following facts are undisputed, as conceded by counsel for plaintiff at oral argument. Larry Dunn was employed by Associated Painting Services, Inc., as foreman of a crew performing sandblasting and painting work on plaintiff's platforms and pipelines located in the Gulf of Mexico pursuant to a contract between APS and plaintiff dated May 20, 1987. Dunn was injured in an accident which occurred on a Transco unmanned platform on the outer continental shelf offshore Louisiana. The accident involved the transfer of a generator by a crane. Dunn

filed a lawsuit in the Eastern District of Louisiana to recover damages for injuries sustained when the generator fell on him. APS subsequently filed a petition for bankruptcy. Plaintiff settled with Dunn on May 10, 1989 and that suit was dismissed.

The affidavit of Floyd McFarland, "Senior Superintendent" in charge of operations and maintenance for plaintiff, establishes that APS provided services on two of plaintiff's fixed offshore platforms which were part of plaintiff's interstate gas pipeline system. The platforms are not drilling platforms; they are "junction platforms" at which various Transco pipelines intersect each other on their way from the offshore Louisiana area to onshore Louisiana and on then to Transco's customers in states other than Louisiana. According to McFarland, the platforms are in no way involved in the drilling, production or servicing of natural gas wells. Transco does not own or operate natural gas wells; it merely buys and transports natural gas that has been produced by others.

Plaintiff does not dispute the provisions of the contract. The key provisions of the contract are as follows:

1. Contractor agrees to furnish at its/his sole expense all labor, materials, tools, supplies and equipment to complete the following work under the terms hereof: Furnish labor and equipment for sandblasting and painting, as requested by Company's representative to perform various maintenance and operational functions to Company facilities located in the Gulf of Mexico and marsh lands of Louisiana. These functions consist of M & R building repairs, spot blasting and spot painting or repainting platform or M & R piping, replacing valve signs, valve lubrication, and other code work. Work is to be supported by TC 278 signed by Company's and Contractor's authorized representatives.

\* \* \* \* \* \*

8. DAMAGES. Contractor agrees to protect, indemnify and save Company harmless from and against all claims, demands and causes of action of every kind and character arising in favor of Contractor's employees, Company or its employees or third parties on account of, occurring in anywise incident to, in connection with or arising out of the work performed for Company under the terms hereof, or in any way resulting from the wilful or negligent acts or omissions of Contractor's agents, employees, representatives or subcontractors ...

"Work" is defined as follows:

"All work called for to be done under and in connection with the work described in the Contract and such [illegible] may be required in writing from time to time by Company's authorized representative."

According to the "Insurance Requirement Exhibit" to the contract, comprehensive general liability insurance obtained by the Contractor "shall name Company and its affiliated and subsidiary companies as an Additional Insured with respect to Contractor's operations hereunder ..."

It is undisputed that Transco was named as an "Additional Assured" with a "waiver of subrogation" in its favor "but only in respect of work performed by named Assured under written contract."

In support of their motion for summary judgment, the Underwriters argue first that the Louisiana Oilfield Indemnity Act, La.R.S. 9:2780, renders null and void the contractual provision that the contractor defend and indemnify plaintiff as well as the provision that plaintiff be named as an additional assured. Defendants alternatively contend that plaintiff is not insured under the contract since the activities in which Dunn was involved at the time of the accident were outside the scope of the contract between APS and plaintiff.

In support of its motion for summary judgment against plaintiff, the worker's compensation intervenor (Transportation Insurance Company) argues that plaintiff must reimburse it for all compensation and medical benefits paid to or on behalf of Larry Dunn. Intervenor contends that Section G of the Oilfield Indemnity Act voids the waiver of subrogation provision in the workers compensation policy. Alternatively, intervenor argues that the policy

waives intervenor's right to recover payments from plaintiff but "only to the extent that you perform work under a written contract." Intervenor argues that the contractual waiver of subrogation is inapplicable since Dunn was, at the time of the accident, performing work outside the scope of the written contract between APS and plaintiff.

■ In opposition to both motions, plaintiff contends that the Oilfield Indemnity Act is inapplicable. Plaintiff has also submitted affidavits in an attempt to show that the off-loading of the generator was a "maintenance and operational function" performed under the terms of the contract. [The MacFarland affidavit declares that "Transco felt" and "considered" the off-loading to be covered under the contract. Plaintiff also claims that the affidavit of Warren J. Toups, Jr., Field Administrative Assistant for Transco, establishes that APS billed Transco for off-loading the generator.]

Initially, the court finds that the facts are not clearly established as to how this maintenance contract was to be performed or the scope of the services included. Therefore, to the extent that defendants and intervenor seek a ruling that the activities in which the injured worker was engaged fell outside the scope of the contract, the motions are DENIED.

We turn to interpretation of the Louisiana statute.

We ought to begin with a clear understanding of what we are about. This case involves an accident which occurred offshore the Louisiana coast on the outer continental shelf and a contract providing for services to be rendered on the outer continental shelf. Federal law applies to the outer continental shelf by reason of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq. In the Lands Act, the Congress has directed the application of the laws of adjacent states. 43 U.S.C. § 1333(a)(2)(A). Thus, we apply Louisiana law. *Rodrigue v. Aetna Casualty and Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969).

Under the Lands Act, we apply state laws to the extent that they are not inconsistent with federal law. No party has suggested the existence of any federal law or policy which would render the provisions of the Louisiana statute inconsistent with federal law and the court is aware of none. The only federal policy apparent to this court is the federal policy in the Lands Act to apply state law. Otherwise, federal law is neutral and Louisiana law will be applied.

In order to determine state law, federal courts look to final decisions of the highest court of the state. When there is no ruling by the state's highest court, it is the duty of the federal court to determine as best it can, what the highest court of the state would decide. *Commissioner of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); *West v. American Tel & Tel Co.*, 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940); *Commonwealth Life Ins. Co. v. Neal*, 521 F.Supp. 812 (M.D.La.) aff'd 669 F.2d 300 (5th Cir.1982).

The Supreme Court of Louisiana has not interpreted the provisions of La.R.S. 9:2780 regarding the issues presented to this court.

Since we are interpreting Louisiana legislation, we should have a clear understanding of that state's approach to law and legislation. Louisiana is a civil law state, meaning that its courts should always look first to the statutory law. As the late Judge Tate put it, "[T]he primary basis of law for a civilian is legislation, and not (as in the common law) a great body of tradition in the form of prior decisions of the courts." Tate, *Techniques of Judicial Interpretation in Louisiana*, 22 La.L. Rev., 727 (1962). Louisiana is a civilian oasis in a desert of common law and, as the Supreme Court of Louisiana has pointed out, the state's own judges sometimes fail to do homage to the legislative word. In *Ardoin v. Hartford Acc. & Indem. Co.*, 360 So.2d 1331 (La.1978), Justice Dennis made it perfectly clear where Louisiana stands:

In deciding the issue before us the lower courts did not follow the process of referring first to the code and other legislative sources but treated language from a judicial opinion as the primary source of law. This is an indication that the position of the decided case as an illustration of past experience and the theory of the individualization of decision have not been properly understood by our jurists in many instances. Therefore, it is important that we plainly state that, ... the notion of *stare decisis*, derived as it is from the common law, should not be thought controlling in this state. The case law is invaluable as previous interpretation of the broad standard of Article 2315, but it is nevertheless secondary information. 360 So.2d at 1334 (footnotes omitted).

Thus, we turn first to the Code in our interpretation of Louisiana law. Article 1 of the Revised Civil Code, effective January 1, 1988, provides, "The sources of law are legislation and custom." Article 2 provides, "Legislation is a solemn expression of legislative will." [1]

■ Turning to the legislation at issue, we quote the pertinent provisions: [2]

A. The legislature finds that an inequity is foisted on certain contractors and their employees by the defense or indemnity provisions, either or both, contained in some *agreements pertaining to wells for oil, gas, or water, or drilling for minerals* which occur in a solid, liquid, gaseous, or other state, to the extent those provisions apply to death or bodily injury to persons. It is the intent of the legislature by this Section to declare null and void and against public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negli-

gence or fault (strict liability) on the part of the indemnitee, or an agent or employee of the indemnitee, or an independent contractor who is directly responsible to the indemnitee.

B. Any provision contained in, collateral to, or affecting *an agreement pertaining to a well for oil, gas, or water, or drilling for minerals*, which occur in a solid, liquid, gaseous, or other state, is void and unenforceable to the extent that it purports to or does provide for defense or indemnity, or either, to the indemnitee against loss or liability for damages arising out of or resulting from death or bodily injury to persons, which is caused by or results from the sole or concurrent negligence or fault (strict liability) of the indemnitee, or an agent, employee, or an independent contractor who is directly responsible to the indemnitee.

C. The term "agreement," as it *pertains to a well for oil, gas, or water, or drilling for minerals* which occur in a solid, liquid, gaseous, or other state, as used in this Section, *means any agreement* or understanding, written or oral, concerning any operations *related to the exploration, development, production, or transportation of oil, gas, or water, or drilling for minerals*, which occur in a solid, liquid, gaseous, or other state, *including* but not limited to *drilling*, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging, *or otherwise rendering services in or in connection with any well drilled* for the purpose of producing or excavating, constructing, improving, *or otherwise rendering services in connection with any mine shaft, drift, or other structure intended for use in the exploration for or production of any mineral*, or an agreement to perform any por-

---

1. The undersigned was much more content with the former version, Article 1 of the 1870 Code: "Law is a solemn expression of legislative will," since it said in one succinct statement that which takes two in the revised version.

2. The undersigned has noted a growing practice in recent years, particularly among federal courts, of religating statutory material to notes

or indeed, omitting it entirely. I have the temerity to suggest that such a practice is not a correct judicial technique to apply in following the civilian approach to interpretation of Louisiana legislation and I cite as my strong authority for that position, Justice Dennis in *Ardoin*, supra.

tion of any such work or services or any act collateral thereto, including the furnishing or rental of equipment, incidental transportation, and other goods and services furnished in connection with any such service or operation.

G. Any provision in any agreement arising out of the operations, services, or activities listed in Subsection C of this Section of the Louisiana Revised Statutes of 1950 which requires waivers of subrogation, additional named insured endorsements, or in any other form of insurance protection which would frustrate or circumvent the prohibitions of this Section, shall be null and void and of no force and effect.

(Emphasis supplied.)

Defendants argue that the phrase contained in Section C of the statute, "operations related to the exploration, development, production or transportation of oil, gas or water," is to be given an expansive reading and used to strike down provisions in contracts such as this one which undisputably relates to transportation of gas. Plaintiff argues that it is only transportation "pertaining to wells for oil, gas, or water, or drilling for minerals" which fall within the legislative intent.

Article 9 of the Civil Code provides, "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature."

Given the contrary positions of the parties and the language of the legislation itself, it is apparent that the law is not "clear and unambiguous" and hence the injunction of Article 9 has no application. Thus, we turn to Articles 10 and 12 of the Code for guidance. Article 10 provides, "When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law."[3] Article 12 provides, "When the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole."

In Section A of the law, "The legislature finds that an inequity is foisted on certain contractors ... by the defense or indemnity provisions ... contained in some agreements...." That section that provides that it is the intention of the Legislature to declare such contracts null and void and against public policy. Section A describes the contracts which are declared to be null as defense and indemnity agreements contained in "agreements pertaining to wells for oil, gas, or water, or drilling for minerals."

Having declared its intent in Section A, Section B declares null and void, "any provision contained in ... an agreement pertaining to a well for oil, gas, or water, or drilling for minerals...."

The language relied upon by defendants is contained in Section C: "The term 'agreement,' as it pertains to a well for oil, gas or water, or drilling for minerals ... means any agreement ... concerning any operations related to the exploration, development, production, or transportation of oil, gas, or water...." Defendants argue that because this maintenance contract is related to transportation of gas, the contract falls within the language and thus bars any indemnity provision which purports to require indemnification where Transco is at fault.[4]

---

**3.** Again, with apologies to the redactors, the undersigned prefers the old version of the Code. Former Article 18 provided: "The universal and most effectual way of discovering the true meaning of a law, when its expressions are dubious, is by considering the reason and spirit of it, or the cause which induced the Legislature to enact it." That statute reminded the judges that their mission is to determine the *intent of the Legislature,* not to inject their own preferences.

**4.** If the Act applies, the settlement which plaintiff entered with the injured workman will prevent an adjudication as to plaintiff's fault and will preclude plaintiff from maintaining that it is not at fault, see *Tanksley v. Gulf Oil Corp.,* 848 F.2d 515 (5th Cir.1988), absent a contrary holding by the Louisiana courts.

**714**

The difficulty with this argument is that the quoted words are not the only words in the statute, or even in Section C. Article 12, supra, of the Code enjoins us to "examine the text of the law as a whole." That obviously means that we must examine the text which comes after the contested phrase, as well as the text which comes before it.

Section C is one long, repetitious, convoluted sentence. If one pares that sentence down to its essentials, it then reads all the way through as follows:

The term "agreement," as it pertains to a well ... or drilling for minerals ... means any agreement related to the ... transportation of oil, gas, or water, or drilling for minerals ... including but not limited to drilling ... or otherwise rendering services in or in connection with any well drilled ... or any mine shaft ... intended for use in the exploration for or production of any mineral,....

Reading the entire text of Section C shows that the Legislature defined "agreement, as *it pertains to a well ... or drilling for minerals.*" Those words modify and limit the word "agreement," which includes "any agreement related to the ... transportation of ... gas ... including ... drilling ... or otherwise rendering services in or in connection with any well drilled...." The agreement described by the statute is limited both before and after the "transportation" phrase by the phrase "as it pertains to a well ... or drilling for minerals ..." and "otherwise rendering services ... in connection with any well drilled ... for use in the exploration for or production of any mineral...."

■ Article 12, supra, reminds us that there is no substitute for looking at what the Legislature actually said in determining the meaning of an ambiguous statute. After examining what the Legislature actually said, this court concludes that the statute invalidates indemnity provisions contained in agreements which pertain to wells for oil, gas or water, including transportation of oil, gas or water in connection with "any well drilled ... or any mine shaft."

This court is fortified in its interpretation by application of Article 10, supra, which tells us to give the law the "meaning that best conforms to the purpose of the law." Section A tells us the "cause" or reason for enacting the law. The Legislature has found an "inequity": Indemnity provisions contained in some "agreements pertaining to wells for oil, gas, or water, or drilling for minerals." The Legislature did not declare that it found an inequity in contracts pertaining to transportation of oil, gas or water. The inequity is declared to be found in contracts pertaining to wells and drilling for minerals.

Section B tells us that it is the purpose of the law to right the inequity described in Section A by declaring such indemnity provisions contained in those contracts null and void. Again, the Legislature used the limiting phrase, "an agreement pertaining to a well, ... or drilling for minerals." There is no reference to transportation of oil, gas or water in Section B.

That phrase is found only in Section C which provides that if transportation of oil, gas or water is in connection with drilling a well, then the statute covers any agreement pertaining to it. The purpose of the statute is to cover all contracts which relate to exploration for and production of minerals, without regard to the type of service rendered.

Let it be made clear that so far as this court is concerned, the Louisiana Legislature has complete power (within certain federal constitutional limitations not here applicable) to declare null and void and against public policy any indemnity agreement which offends that body. The issue is whether the Legislature here intended to declare null indemnity provisions included in agreements relating to the transportation of oil, gas or water, or whether the Legislature intended to declare null only indemnity provisions included in those transportation agreements which relate to or pertain to production of minerals.

The court fully concurs with defendants that the provisions of Section C should be read expansively so as to strike down every

indemnity agreement that the Legislature intended to nullify, whether that particular type of agreement is specifically named in Section C or not. The court must not, however, by "expansive" reading extend the legislation to contracts which the Legislature did not intend to prohibit. In a civilian jurisdiction, a court is not free to add its own gloss to legislation after it has, in the words of former Article 18, "discovered" the legislative intent. Here, the Legislature has used the phrase "agreements pertaining to wells for oil, gas, or water, or drilling for minerals" three separate times in describing that which it intended to declare null. Careful reading of what the Legislature said, careful consideration of the purpose of the law and reading the text of the law as a whole leads to the inexorable conclusion that the Legislature intended to declare null only those indemnity provisions, whether they be for transportation or other services, which are included in "agreements pertaining to wells for oil, gas, or water, or drilling for minerals."

The same type of inequity may also exist in contracts relating to maintenance in petroleum refineries. But, the Louisiana Court of Appeal for the Fourth Circuit has declined to expand the Act to refinery contracts. See *Griffin v. Tenneco Oil Co.*, 519 So.2d 1194 (La.App. 4th Cir.1988), writ denied, 521 So.2d 1154 (La.1988). That intermediate appellate court there noted:

> The statute repeatedly refers to agreements 'pertaining to a well [or wells] for oil, gas or water or drilling for minerals.' The Tennaco—MRO contract is clearly not an agreement relating to wells or drilling. Refining operations are not mentioned anywhere in the statute, although the Legislature could have easily included such operations had it wanted to do so. In our view, the recurring reference to wells and drilling combined with the rather general language relied upon by MRO makes the statute ambiguous. (519 So.2d at 1195).

The court then cited this court's opinion in *Clarkco Contractors v. Texas Eastern Gas Pipeline*, 615 F.Supp. 775 (M.D.La. 1985) and further noted:

> ... The Legislature was obviously concerned about wells and drilling, not about pipeline transportation or refining of oil, and this concern is reflected in this statute. We will not extend the scope of the statute beyond the legislative intent by broadly interpreting an isolated phrase. We therefore conclude that the Anti–Indemnity Statute does not apply to the Tenneco–MRO agreement. (519 So.2d at 1196).

As noted earlier, the Supreme Court of Louisiana has not addressed this issue. At least two courts have held that the "related to" language of the Act should be broadly construed. *Copous v. Odeco Oil & Gas Co.*, 835 F.2d 115 (5th Cir.1988); *Livings v. Service Truck Lines of Tex., Inc.*, 467 So.2d 595 (La.App. 3d Cir.1985).

It is readily apparent that the decided cases are not completely harmonious on the applicability of the Act to a contract concerning services performed in connection with a gas transmission pipeline. One need only compare this court's opinion in *Clarkco Contractors v. Texas Eastern Gas Pipeline*, 615 F.Supp. 775 (M.D.La.1985) (holding that the Act did not apply to a pipeline contract between Texas Eastern, a major natural gas transmission company, and Clarkco, its pipeline contractor, in connection with a pipeline explosion and fire which occurred in West Feliciana Parish) with *Murray v. Trunkline Gas Co.*, 544 So.2d 28 (La.App. 4th Cir.1989), writ denied 547 So.2d 1317 (La.1989) (applying the Act to a contract for welding services on an offshore gas line platform) and *Ferguson v. Stringray Pipeline Co.*, 672 F.Supp. 944 (W.D.La.1987) (holding Act applicable to contract for replacement of recuperators on a compression station on a natural gas line platform located offshore).

While *Murray* and *Ferguson* distinguished *Clarkco* on the basis of locality, (offshore versus land based), this court sees no significance to locality. The Third Circuit Court of Appeal has recently held that the Act was applicable to a contract for services rendered on shore. See *Fuselier v. Amoco Production Co.*, 546 So.2d 306 (La.App. 3d Cir.1989), writ denied, 551

**716**

So.2d 630 (La.1989) (involving "bush-hogging" at an Amoco production site in Evangeline Parish).

The court remains convinced, as stated in *Clarkco,* that the Louisiana Legislature did not intend for the Act to extend to natural gas transmission pipelines which are not related to exploration or production and the court finds support in that position from *Griffin v. Tenneco Oil Co.,* 519 So.2d 1194 (La.App. 4th Cir.1988), writ denied 521 So.2d 1154, which is discussed above. While there are intermediate state appellate decisions which seem to construe the Act less restrictively, this state's highest court has not yet considered this issue. The analysis which we have undertaken convinces this court that the Supreme Court of Louisiana, if presented with the issue, would hold that the phrase "related to ... transportation of ... gas" should be read in conjunction with the phrase "pertaining to wells for oil, gas, or water, or drilling for minerals."

For the foregoing reasons, the motion for summary judgment on behalf of the defendants is hereby DENIED and the motion for summary judgment on behalf of intervenor is hereby DENIED.